## Commonwealth *vs.* Heraclito J. Segovia.

No. 99-P-949.

Worcester. April 17, 2001. - November 7, 2001.

Present: Greenberg, Duffly, & McHugh, JJ.

*Constitutional Law,* Assistance of counsel, Self-incrimination. *Practice, Criminal,* Assistance of counsel, Motion to suppress.

At a criminal trial, the defendant's counsel was ineffective in failing to file a motion to suppress the defendant's videotaped custodial interrogation, where the defendant had a viable claim that the police officer conducting the interrogation ignored the defendant's request for a translator and a paralegal before continuing with the questioning, and where the failure to file a motion to suppress likely deprived the defendant of an otherwise available, substantial ground of defense, in that the interrogation led to the discovery of a witness who provided testimony at trial that was damaging to the defendant's defense and placed the defendant in the position of having to explain away this testimony, which may have adversely affected the defendant's credibility in the eyes of the jury. [190-194]

Indictment found and returned in the Superior Court Department on June 5, 1998.

The case was tried before *Francis R. Fecteau,* J., and a motion for a new trial was heard by him.

*Geraldine C. Griffin* for the defendant.

*Susanne Levsen Reardon,* Special Assistant District Attorney, for the Commonwealth.

Greenberg, J. The defendant was convicted by a Superior Court jury of operating a motor vehicle upon a public way and, to avoid prosecution, going away without stopping and making known his name after knowingly causing the death of a pedestrian. G. L. c. 90, § 24(2). Subsequently, the defendant filed a motion for new trial, alleging that his trial counsel's performance had failed to meet minimum constitutional

requirements. After a nonevidentiary hearing, the defendant's motion was denied by the trial judge.

The gist of the defendant's argument is that his trial counsel was ineffective in not filing a suppression motion of the defendant's videotaped custodial interrogation conducted by the lead investigator, Detective Scott Szymekiewicz, twenty-seven days after Ruth Harper's body was discovered on School Street in the town of Boylston.

In order to determine the validity of the claim of ineffective assistance of counsel, "a discerning examination and appraisal of the specific circumstances of the given case" is required. *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).

On January 19, 1998, Harper went for her customary early-morning walk near her home in Boylston. It was dawn and a dusting of snow had fallen during the previous evening. At some time between 6:25 A.M. and 7:00 A.M., a vehicle struck her and left the scene. When a neighbor, Richard Vachon, drove back to his house on School Street just before 7:00 A.M., he noticed a lit flashlight on the side of the road which caused him to slow down. A dark mass in a snowbank turned out to be Harper, a woman he regularly saw walking in the morning. An autopsy revealed that she had sustained a broken neck, as well as multiple blunt traumas.

After Harper's body was discovered, State and town police combed the area for evidence. Besides Harper's scattered effects — broken eyeglasses and gloves — they found plastic fragments with a "Tridon 19" label that looked like they came from a windshield wiper. One set of tire tracks in the snow appeared very close to where Harper's body was found. Castings of the tire marks were made at that time.

In the weeks that followed, the police scoured the region for the car that struck Harper. The police sent fliers to glass stores in the central Massachusetts area asking them to contact the police if anyone came in for windshield replacement. Szymekiewicz contacted the Tridon company and obtained a list of vehicles that might use "Tridon 19" wiper blades.

On February 13, 1998, Szymekiewicz stopped a 1994 Nissan

Sentra motor vehicle driven by the defendant.[1] He noticed that the car, registered to the defendant, "had some scratches in the hood area, the front area, above the headlight" and that "the radio antenna on the right side of the car, the passenger side was bent." More critically, the vehicle appeared to have a new windshield. When questioned about it, the defendant explained that a friend had accidently cracked his windshield with a hand tool at an auto repair shop where the friend 'worked. The defendant showed Szymekiewicz a repair worksheet for his windshield replacement. It was dated January 19, 1998. As to the nature of the damage on the replaced windshield, the defendant said that "there was a small crack just below the inspection sticker." Inside the car, Szymekiewicz noticed a windshield wiper, still in its packaging — it was a "Tridon 20" inch wiper. The other salient observation that he made was that the rear tires were Cooper Life Liner Classic II's. Before the conversation ended, Szymekiewicz asked the defendant, who was a Brazilian national, whether he was delivering newspapers on January 19 "or something to that effect."[2] When the defendant answered affirmatively, Szymekiewicz put the question whether "he ran over the lady." The defendant, who spoke little English, responded that he didn't understand the question.

Concluding their conversation, they parted. Szymekiewicz obtained a search warrant for the vehicle, had it removed from the defendant's possession, and took it to the Boylston police station.

Two days later, on February 15, 1998, the defendant was arrested and brought to the police station where Szymekiewicz conducted a videotaped interrogation of the defendant that dragged on for nearly two hours. The first forty-five minutes of that videotape were played for the jury's benefit at trial.[3] It depicts the defendant seated on a metal bench inside a room

---

[1]Nothing in the record indicates the circumstances of the stop. However, the parties agree that the ensuing conversation and the observation of the car were the result of a noncustodial inquiry.

[2]There were newspapers in the front passenger seat of the defendant's car, some stacked on the floor in front of the seat, and still others on the rear seat and in between the bucket seat areas.

[3]The trial transcript reflects only that the videotape was shown to the jury. The videotape was marked as an exhibit for identification but never entered as

with Szymekiewicz and at least one other officer in the background. The defendant's left arm is shackled to a wall. At the outset, the defendant told Szymekiewicz that he could not understand what Szymekiewicz was saying, that he was Brazilian, and that his native language was Portugese spoken with a Brazilian dialect. His English was marginally understandable — he asked Szymekiewicz whether he might call for a translator, a friend "who was an American and a paralegal." Szymekiewicz handed the defendant a cellular telephone that the defendant used to call his friend, who did not answer. Simultaneously, Miranda rights were recited by the officer, but the defendant repeated that he needed the help of a translator.

Again, Szymekiewicz, in a casual tone, told the defendant that he "just want[ed] to hear [the defendant's] side of the story." The defendant expressed concern because he could not understand, and wanted to wait until he could reach his friend. Szymekiewicz agreed to wait, but added that he would just ask the defendant some routine booking questions. At this point, Szymekiewicz confronted the defendant with the charges, showed him the arrest warrant, and asked the defendant whether he understood the charges. In response, the defendant claimed that he never hit anyone. This prompted Szymekiewicz to continue his questioning regarding the events of January 19 for another twenty minutes.[4]

During this discussion, the defendant admitted that he was delivering newspapers in his car in the early morning of January 19, once again disclaiming having hit a person or "anything else." When asked about the crack in the windshield, he gave the same explanation given on February 13. Pressed by Szymekiewicz for the name of his coworker at the automobile repair shop, the defendant said, "Adailton Ruback," and at the officer's request, spelled the name, in English. In response to

an exhibit. Because the interrogation was central to the defendant's motion for a new trial, the contents of the videotape are described in our opinion. The parties have agreed that the videotape be viewed by the panel.

[4]In his affidavit in support of his new trial motion, the defendant explained that he responded to Szymekiewicz's questions during the interrogation "as best he could because he thought he had to." The defendant had never before been arrested and claims that he did not understand that he had the right to remain silent.

further inquiry, the defendant gave the officer the name of Ruback's principal employer.

The foregoing is the substance of the videotaped interrogation and of Szymekiewicz's testimony concerning the station house inquiry, to which should be added that the defendant stated several times that he needed a translator and a "paralegal" because he did not completely understand all of the questions. In response, Szymekiewicz insisted on the defendant articulating what he failed to comprehend, then talked over him, and failed to ascertain the nature of the defendant's confusion. While Szymekiewicz allowed that the defendant could obtain an attorney, he also told the defendant that it would take a "couple of days" (the arrest was on Friday), thereby suggesting that the defendant could not avail himself of an attorney until his arraignment on Monday. Toward the end of the videotape — on a portion not shown to the jury — Ruback and another friend appeared at the station and were ushered into the interrogation room where the defendant repeated that he wanted a "legality."

After the showing of the videotape of the interrogation, Ruback testified that in response to the defendant's call, he went to the police station that night. He did not offer to tell the police anything he knew, and they did not ask him any questions. However, he testified that on February 24, 1998, Szymekiewicz came to his workplace, read him his Miranda rights, and asked him questions about his role in the incident. Ruback had observed another larger crack in the windshield on January 19. This damage was distinct from the smaller crack which he accidently caused by dropping a hand tool in December, 1997. He failed to disclose this information during the February 24 interview. During the trial, by way of explanation, he testified that he had omitted this information because he was afraid and thought it might hurt the defendant. He also testified that it was his idea to fix the defendant's windshield on January 19.

The defendant took care in his testimony not to contradict various basic facts testified to in the case-in-chief, but to weave around them. After some evasion, he said that it was possible that he had been driving on School Street at about 6:30 A.M. on the day in question. He acknowledged that, while he was driving in that area, he felt something hit his windshield and cause

it to crack. He did not know what the object was and did not see anything in front of him before or after the windshield cracked. It was snowing, and the unlit road was dark. With Ruback's assistance, on January 19, he filled out an insurance claim for coverage to pay for the windshield replacement. Prior to January 19, his car was already scratched and dented and the antenna was bent. His niece verified this when she was called as a witness. It was not until September, 1998, after the defendant's lawyer showed him all of the physical evidence that the prosecutor had disclosed about the car that hit Harper, that the defendant realized that he was responsible. He testified that if he had known he had struck a person that morning, he would have stopped.

Upon his direct examination, the defendant brought out the circumstance regarding his not telling Szymekiewicz that something had cracked his windshield on January 19. He was nervous and afraid because he did not know what was going to happen to him after his arrest. He thought he would be in trouble if he had struck someone, even if he was unaware of having done so at the time.

In denying the motion for a new trial, the judge adopted defense counsel's view of the decision not to file a motion to suppress the videotaped interrogation. Counsel's affidavit was to the following effect. In discussions with the defendant prior to trial, two theories of defense were considered: one was that the defendant did not operate the car which struck Harper, and the other was to admit that he hit her but deny that he knowingly fled from the scene of the accident. Because of the strong circumstantial evidence establishing the connection between his vehicle and the accident, a decision was made to follow the latter option. Defense counsel opined that this theory of defense was best bolstered by the defendant's testimony as to his state of mind and actions at the time of the accident. Counsel considered the defendant's testimony crucial in clarifying why he did not originally admit his involvement on February 13 when he was stopped in his car and questioned by Szymekiewicz. Counsel did review the contents of the videotape as part of his pretrial preparation but had not looked at it since. At the time he drafted his affidavit a year after the trial, he "did

not recall feeling that there was a strong argument that the [defendant's] statements were given in violation of the defendant's Miranda rights."

*Analysis.* Strategic or tactical matters "rest ultimately in counsel, with the degree of required client consultation and participation dependant on the circumstances. See generally 2 LaFave, [Israel, & King,] Criminal Procedure § 11.6 (1984); 1 ABA Standards for Criminal Justice § 4-5.2 and commentary (2d ed. 1980). Cf. *Commonwealth* v. *Amirault,* 424 Mass. 618, 645 n.19, 652 n.24 (1997)." *Commonwealth* v. *Conley,* 43 Mass. App. Ct. 385, 391 (1997). That the decision not to file the motion to suppress the videotape on Miranda grounds might be characterized as a trial tactic, does not in itself render the decision immune from scrutiny. See *Commonwealth* v. *Adams,* 374 Mass. 722, 728-729 (1978). Failure to file a motion to suppress may warrant an ineffective assistance finding under either the Federal standard, see *Strickland* v. *Washington,* 466 U.S. 668, 686 (1984), or the less strict State rule, see *Commonwealth* v. *Saferian,* 366 Mass. at 96. See *Kimmelman* v. *Morrison,* 477 U.S. 365, 385 (1986). Where, as here, a defendant claims that counsel was ineffective, the defendant must show that the motion to suppress would have presented a viable claim and that "there was a reasonable possibility that the verdict would have been different without the excludable evidence." *Commonwealth* v. *Pena,* 31 Mass. App. Ct. 201, 205 (1991). See *Commonwealth* v. *DiGeronimo,* 38 Mass. App. Ct. 714, 719, 729-730 (1995). Once satisfying that requirement, the defendant need do no more — the burden is then cast on the Commonwealth to demonstrate that the admission of the evidence was harmless beyond a reasonable doubt. See *id.* at 730.

First, we inquire whether a suppression motion in these circumstances would have presented a viable claim. The motion judge, who also presided at the trial and viewed the videotape, made no finding as to whether or when Miranda warnings were given during the station house interview after the defendant's arrest. However, it is evident from the videotape that Szymekiewicz read the Miranda rights to the defendant at the beginning of the interview. At the conclusion of the reading, the defendant told Szymekiewicz that he needed a translator because he did

not understand everything that was recited by Szymekiewicz. The defendant also requested a consultation with a friend, a paralegal. A reasonable police officer would understand this to be a request for legal counsel. A suspect must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer, in the circumstances, would understand the statement to be a request for an attorney." *Davis* v. *United States*, 512 U.S. 452, 459 (1994). Despite this request for counsel, Szymekiewicz continued his questioning even though the defendant tried, albeit unsuccessfully, to contact his friend. Under the guise of asking the defendant some booking questions, see *Commonwealth* v. *Guerrero*, 32 Mass. App. Ct. 263, 267-268 (1992) (Miranda rights not required before asking routine booking questions), Szymekiewicz continued to press the defendant for details concerning the accident.

We need not inquire whether there was enough in the present case to show that the defendant understood his rights. The defendant stated that he wanted to wait for a translator and a paralegal before continuing with the questioning. Szymekiewicz ignored the defendant's requests and, without any indication that the defendant wanted to talk, began asking more questions about the accident. See *Commonwealth* v. *Jackson*, 377 Mass. 319, 326 (1979) (statements should have been suppressed when police made deliberate decision to interrogate defendant in spite of his desire to remain silent, by initiating conversation that was designed to circumvent defendant's decision to remain silent).

The crux of the problem, however, is whether the second prong of the rule in *Commonwealth* v. *Saferian*, 366 Mass. at 96, has been satisfied — that counsel's failure has "likely deprived the defendant of an otherwise available, substantial ground of defense." On this point, appellate counsel for the defendant posits the following: Ruback was called by the prosecution during its case-in-chief. He acknowledged that he had been in the defendant's car on the morning of January 19 and admitted that he had seen a fresh crack in the windshield, different from the one he had accidently caused on an earlier occasion in the repair shop with a hand tool. Ruback also revealed in his direct testimony that the defendant told him that he hit something on School Street that morning, although he

said he did not know what it was. Finally, Ruback also admitted that when the police questioned him, he lied to them and failed to disclose anything about the newer (and larger) crack in an effort to protect the defendant. This testimony, appellate counsel argues, should have been suppressed as "fruit of the poisonous tree." See *Wong Sun* v. *United States*, 371 U.S. 471, 488 (1963); *Commonwealth* v. *Ramos*, 430 Mass. 545, 550-551 (2000). Compare *Commonwealth* v. *Lahti*, 398 Mass. 829, 836 (1986), cert. denied, 481 U.S. 1017 (1987) (victim's testimony suppressed where defendant disclosed victim's identity as result of involuntary statement to police), with *Commonwealth* v. *Gallant*, 381 Mass. 465, 468-471 (1980) (codefendant's statement to police not suppressed where police knew of his involvement in crime before obtaining defendant's statement identifying codefendant in violation of Miranda).

The present case conforms with the *Lahti* pattern. Without Ruback's testimony, the strength of the Commonwealth's case with respect to the defendant's line of defense — that he was not aware of hitting anyone — and his credibility with respect to the windshield repair, would have been seriously weakened. Szymekiewicz knew that and took pains to elicit Ruback's name and employment information from the defendant at the end of the interview. Even though the Commonwealth, on appeal, argues that subsequent police investigation of the matter would have turned up Ruback's involvement without the defendant's disclosure, the judge did not entirely agree. He wrote that, "[w]ith respect to the testimony of Ruback, I cannot find as a matter of fact based upon the record before me that the police would have inevitably discovered his identity from sources other than the defendant." He went on to state that it was "conceivable" that the police would have learned about Ruback from independent sources.

Disengaged from the discovery of Ruback is a possible second issue: did the admission of the defendant's own comments during the custodial inquiry affect the outcome of the trial? We think the defendant's comments could be found by the jury to have adversely affected his credibility. Some of his statements to Szymekiewicz about the hours of his newspaper delivery on January 19 were shown to be inconsistent with the

records produced by the distributor that employed him. Trial counsel took care in his posttrial affidavit not to contradict the strong case for suppression of these statements, but to weave around them. Counsel stated that "given that I expected that the defendant was going to testify at trial [to establish the scienter defense] and thus would be subject to impeachment with his prior inconsistent statements even if a motion to suppress had succeeded, I did not file such a motion." And the trial judge agreed by finding that trial counsel's judgment to place the defendant on the stand was not "manifestly unreasonable." This reasoning, however, misses the point: by having the defendant testify, without moving to suppress Ruback's damaging testimony about the cover-up of the windshield repair, the defendant was placed in the untenable position of having to explain why he failed to disclose this circumstance from the very beginning. From this, the jury could infer that the impact was greater than he originally admitted, thus sealing his fate on the mens rea element. Without Ruback's testimony, it would have been difficult, if not impossible, for the Commonwealth to prove the impact was of sufficient severity to put the defendant on notice that he had struck a person.

In its brief, the Commonwealth overlooks much of the evidence presented in the case-in-chief from both Szymek-iewicz's testimony concerning the defendant's interrogation, the videotape itself, and Ruback's testimony. The Commonwealth seems to defend trial counsel's decision to forgo a motion to suppress as reasonable because it eliminated the possibility of any prior inconsistent statements that the defendant would have made at the suppression hearing from being used to impeach his trial testimony. That approach will not do, however, because it presupposes the defendant's testimony at the suppression hearing, a circumstance that was not inevitable, since the videotape itself reveals serious Miranda flaws. For completeness, however, we suggest that the damage caused by the admission of the videotape, in combination with Ruback's trial testimony, opened the door to numerous negative inferences against the defendant, all of which were explored in the prosecutor's opening and closing speeches to the jury. Indeed, in his closing, the prosecution stated, "[t]his case didn't change until his friend [Ruback]

took the stand and put him on School Street, and that was a surprise." He went on to propose that Ruback's testimony showed that the defendant concocted a false story as a cover-up because the defendant knew he had struck a pedestrian and wanted to hide that fact from the police.

We conclude that in these circumstances, looking at counsel's action with the required highly deferential scrutiny, see *Strickland* v. *Washington*, 466 U.S. at 689, counsel's failure to file the motion to suppress the videotaped interrogation of the defendant was "manifestly unreasonable" and that counsel's failure has "likely deprived the defendant of an otherwise available, substantial ground of defense." *Commonwealth* v. *Saferian*, 366 Mass. at 96. The defendant's motion for a new trial should have been allowed.

*Judgment reversed.*

*Verdict set aside.*