## COMMONWEALTH *vs.* KEVIN DENIS.

Suffolk. April 9, 2004. - September 17, 2004.

Present: MARSHALL, C.J., GREANEY, SPINA, SOSMAN, & CORDY, JJ.

*Practice, Criminal,* Instructions to jury, Reasonable doubt, Assistance of counsel, New trial, Admissions and confessions, Capital case. *Homicide. Malice. Evidence,* Consciousness of guilt, Admissions and confessions. *Identification. Constitutional Law,* Assistance of counsel.

In a criminal case, the judge's instruction on reasonable doubt did not impermissibly reduce the Commonwealth's burden of proof or otherwise constitute error, where the judge used the term "moral certainty" in combination with other wording that gave it appropriate meaning, and where the judge's admonition that the jury disregard the concept of proof "beyond a shadow of a doubt" and his giving multiple examples of what reasonable doubt was not did not constitute error. [621-622]

At the trial of indictments charging, inter alia, murder in the first degree, the judge's erroneous inclusion of the second prong of malice in his instruction on deliberately premeditated murder did not create a substantial likelihood of a miscarriage of justice, where he stressed that deliberate premeditation must include an intent to kill, and where he was not required to instruct jurors that they were not to consider the defendant's actions after the shooting on the issue of premeditation [622-624]; further, there was no likelihood that the judge's characterization of identification as a crucial issue and one of the most important issues in the case caused the jury to overlook state of mind issues, and no error in the judge's use of illustrations and examples while advising jurors that he was expressing no opinions on the merits of the case [624-625].

No substantial likelihood of a miscarriage of justice arose from defense counsel's assistance at the trial of indictments charging, inter alia, murder in the first degree, where defense counsel's concessions in his opening statement and closing argument were not manifestly unreasonable, and where his failure expressly to ask the jury to return a verdict of murder in the second degree would not have influenced the jury's decision [625-628]; further, the judge did not abuse his discretion in ruling on the defendant's motion for a new trial without holding an evidentiary hearing, where the judge determined that the motion did not make an adequate showing with respect to any of the alleged instances of ineffective assistance of counsel, including counsel's general preparation and investigative efforts [628-630], and counsel's failure to seek suppression of the defendant's confession, either on the ground that he invoked his right to counsel by requesting to contact his former high school guidance counsellor [630-632] or on another theory of suppression that was supported only by the defendant's self-serving affidavit [632-634].

INDICTMENTS found and returned in the Superior Court Department on September 1, 1994.

The cases were tried before *James D. McDaniel, Jr.,* J., and a motion for a new trial, filed on May 8, 2002, was considered by *Peter M. Lauriat,* J.

*Daniel J. Johnedis* for the defendant.

*Joseph M. Ditkoff,* Assistant District Attorney, for the Commonwealth.

SOSMAN, J. The defendant was convicted of murder in the first degree on all three theories (deliberate premeditation, extreme atrocity or cruelty, and felony-murder), two counts of armed assault with intent to rob, and unlawful possession of a firearm. The defendant's motion for a new trial was denied without an evidentiary hearing by a judge who was not the trial judge.[1] On appeal from the convictions and from the denial of his motion for a new trial, the defendant asserts that the jury instructions were erroneous; that trial counsel was ineffective in various respects, and that the motion judge erred in denying his motion for a new trial without holding an evidentiary hearing. He also asks that we exercise our power under G. L. c. 278, § 33E, to grant him a new trial or reduce the verdict to murder in the second degree. For the following reasons, we affirm the convictions, affirm the order denying the defendant's motion for a new trial, and decline to grant relief under G. L. c. 278, § 33E.

1. *Background.* We summarize the evidence in the light most favorable to the Commonwealth, reserving certain details for discussion in conjunction with the issues raised. On the evening of August 19, 1994, the victim, seventeen year old Diron Spence, stood on the corner of McLellan and Bradshaw Streets in the Dorchester section of Boston, talking to his friend, Cavell Rice. Two young women, friends of Spence, were walking down Bradshaw Street, and paused briefly to speak with Spence before continuing on their way down McLellan Street.

Moments after the women passed by, the defendant, wearing black pants, a black jacket, and a black ski mask, approached Spence and Rice and demanded their money. Rice immediately began emptying his pockets, but Spence just stood there. The

---

[1]The trial judge was nearing retirement by the time the motion was filed.

defendant asked, "Think I'm playing?" He then pulled out a .357 Magnum revolver and shot at Spence from a distance of a few feet. As that first shot was fired, Rice ran away, without turning over any of the contents of his pockets. Four more shots were fired; three bullets hit Spence, including a fatal wound to the chest.

The defendant then fled, running down McLellan Street. Manuel Barros, who had been sitting on the front porch of his house on McLellan Street, saw the defendant slow to a walk, remove (but not discard) his mask, and put on a hat. Barros notified the police using his portable telephone, and followed the defendant as he turned onto Fowler Street. The defendant disappeared into the driveway of 14 Fowler Street momentarily, then reemerged and entered 8 Fowler Street, a three-family house. Barros kept the police apprised of the defendant's movements, and they arrived at the scene within minutes of the defendant's entry into 8 Fowler Street. The police surrounded the building and, from the rear, observed someone up on the third-floor porch. The police were let into the building by a man coming out the front door, and they proceeded to the third floor. They entered the apartment through an unlocked door and found several persons inside, including the defendant, who appeared nervous and sweaty. A frisk of the defendant uncovered no weapon.

The weapon was soon found under a towel on the washing machine in the kitchen.[2] The defendant volunteered that he was the one who had brought the gun into the house.[3] He was then handcuffed and seated in the kitchen. As he was being seated, the defendant asked, "Is he dead? Is he dead?" The defendant

[2] A detective testified that the weapon was discovered fortuitously when he leaned on the washing machine after slipping on a wet floor. At no time did the defendant contest the manner in which the gun was found, nor did he seek to suppress any of the physical evidence that was ultimately seized from the apartment. On appeal, he raises no issue with respect to the gun or the other physical evidence. Reviewing the entire record under G. L. c. 278, § 33E, we similarly see no basis for suppression of this evidence.

[3] At the hearing on the defendant's motion to suppress his statements, there was evidence that, on the discovery of the weapon on the washing machine, other occupants of the apartment yelled at the defendant to "[g]ive it up," and that his statement concerning the weapon was made in response to his friends' urging. At trial, the jury did not hear evidence of the statements made to the defendant by those other persons.

was then given Miranda warnings, but no questions were asked of him at that time. A resident of the apartment directed one of the officers to a day bed in the living room, and the officer found a black cap under the mattress.

The officers took the defendant outside to see whether Barros could identify him. At that time, the defendant did not have on any hat, nor did he have on the jacket he had been wearing. An officer in plain clothes, and of an appearance generally similar to the defendant, was instructed to walk along with the defendant with his hands behind his back as if he, too, were in custody. Barros identified the defendant as the man he had seen running from the scene of the shooting. The defendant was then transported to the police station, while other officers remained on site to secure the apartment in anticipation of a search warrant.

During the ride to the station, the defendant spoke about his former high school and about his plans to start college within a few weeks. The detectives knew some of the teachers and officials at that particular high school, and they exchanged pleasantries with the defendant about their mutual acquaintance with persons associated with that school. The defendant asked the detectives to contact a guidance counsellor at the high school, a person who was well known to them. They attempted to do so, but were informed that the guidance counsellor was out of town.

On arriving at the station, the defendant was again given his Miranda warnings, and he signed a form acknowledging his waiver of those rights. His ensuing interrogation was tape recorded, as was yet another administration of the Miranda warnings. During the interrogation, the defendant was lucid and responsive, and he did not appear to be under the influence of alcohol or drugs. He explained to the officers that, for reasons of personal safety, he often carried a gun when he was out on the streets. He had been walking by himself when he came upon Spence and Rice, who were "just staring" at him. Spence laughed at him, and then turned away "as if he's going to grab something." The defendant "wasn't sure" what Spence might have been going to grab — it "could have been a knife" or it "[c]ould have been nothing." The defendant then fired "[a]bout

three" shots at Spence, "hit him once or twice," and then fled to his friend's apartment on Fowler Street. There, he removed his jacket and put the gun under a towel on the washing machine. He said that he could not remember what he had done with his cap. He denied that his face had been covered during the incident.

After the defendant completed his statement, the police obtained a warrant to search the apartment at 8 Fowler Street. Pursuant to that warrant, they seized the gun, the cap, and a black jacket. Subsequent testing confirmed that that gun had been used to shoot Spence.

2. *Discussion.* a. *Jury instructions.* The defendant argues that the judge's instructions were erroneous in several respects. In examining a claim of error in jury instructions, we do not look at individual phrases taken out of context; rather, we consider the instructions viewed as a whole. *Commonwealth* v. *Gunter*, 427 Mass. 259, 267 (1998). *Commonwealth* v. *Rosa*, 422 Mass. 18, 27 (1996). Where, as here, the defendant failed to object to the instructions at trial, we review the instructions to determine whether any error in those instructions creates a substantial likelihood of a miscarriage of justice. G. L. c. 278, § 33E. *Commonwealth* v. *Blanchette*, 409 Mass. 99, 104-105 (1991).

i. *Instruction on reasonable doubt.* The defendant argues that the instruction on proof beyond a reasonable doubt was constitutionally infirm. In reviewing a reasonable doubt instruction, we consider whether there is a "reasonable likelihood" that the instruction led the jury to believe that they could convict the defendant on proof insufficient to dispel reasonable doubt. *Commonwealth* v. *Pinckney*, 419 Mass. 341, 342 (1995). The defendant argues that the judge's repeated use of the term "moral certainty," his references to proof "beyond a shadow of a doubt," and his resort to examples of what does not constitute reasonable doubt allowed the jury to convict him on a lower standard of proof. We disagree.

The defendant points to the fact that the judge used the term "moral certainty" four times in his charge, and cites to cases that question that term's usefulness in describing the standard of proof required for conviction. *Victor* v. *Nebraska*, 511 U.S. 1, 16 (1994). *Commonwealth* v. *Pinckney*, *supra* at 345. However,

while references to "moral certainty" made in isolation and without further explanation may amount to an erroneous instruction on reasonable doubt, use of the term does not constitute reversible error when the instruction includes other language giving the term an appropriate context. *Id.* at 344-345. Here, the judge's first two references to "moral certainty" came within a verbatim *Webster* charge, see *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850), a context that is wholly appropriate. See *Commonwealth* v. *LaBriola*, 430 Mass. 569, 572-573 (2000), and cases cited. Thereafter, he used the term two more times while explaining the concepts of circumstantial evidence and permissible inferences. Again, the term was not used in isolation but rather in combination with other wording that gave it appropriate meaning. The judge told the jury that they should not convict the defendant on circumstantial evidence unless that evidence was sufficient "to produce a moral certainty of guilt and to exclude any other reasonable theory," and was "of a conclusive nature and tendency leading on the whole to a satisfactory conclusion and producing a reasonable and moral certainty that the accused committed the offense." This terminology adequately conveys the degree of certainty required for a conviction based on circumstantial evidence. *Id.* at 573-574.

The defendant also claims error in the judge's admonition that the jury disregard the concept of proof "beyond a shadow of a doubt." Although we have held that contrasting "beyond a shadow of a doubt" with "beyond a reasonable doubt" is "unlikely to be helpful to a jury," we have not found error in such an instruction. *Commonwealth* v. *Richardson*, 425 Mass. 765, 768 (1997). Finally, the defendant argues that the judge's giving "multiple examples of what reasonable doubt was not" impermissibly reduced the Commonwealth's burden of proof. We have previously determined that this type of instruction does not constitute error. *Commonwealth* v. *O'Brien*, 432 Mass. 578, 592 (2000), citing *Commonwealth* v. *Seay*, 376 Mass. 735, 745-746 (1978).

ii. *Instruction on theories of murder in the first degree.* The defendant claims there was error in the judge's instructions on each of the three theories of murder in the first degree. In his instruction on deliberately premeditated murder, the judge's

definition of malice erroneously included the so-called second prong of malice. It is now well established that, for purposes of a conviction of deliberately premeditated murder, malice can only mean the first prong of malice, i.e., a specific intent to kill. See *Commonwealth* v. *Simpson*, 434 Mass. 570, 588 (2001), and cases cited. However, we have repeatedly held that where the judge has erroneously included second or third prong malice (or both) in the definition of malice, a "correct instruction on deliberate premeditation suffices to avoid any substantial likelihood of a miscarriage of justice." *Commonwealth* v. *Reaves*, 434 Mass. 383, 393 (2001). See *Commonwealth* v. *Duran*, 435 Mass. 97, 111 (2001); *Commonwealth* v. *Jenks*, 426 Mass. 582, 585 (1998); *Commonwealth* v. *Diaz*, 426 Mass. 548, 553-554 (1998). In his deliberate premeditation instruction, the judge stressed that deliberate premeditation must include an intent to kill. The judge referred to "the decision to kill," "resolution to kill," and a "conscious and fixed purpose to kill." Given this emphasis in the deliberate premeditation instruction, the jury would not have thought that a conviction could be based on anything less than an intent to kill.[4]

The defendant also argues that the judge should have instructed the jurors that they were not to consider the defendant's actions after the shooting on the issue of premeditation. "[W]e have not required trial judges to give an explicit instruction preventing the jury from considering evidence of consciousness of guilt in connection with issues such as deliberate premeditation or malice aforethought." *Commonwealth* v. *Dagenais*, 437 Mass. 832, 843-844 (2002). "[W]here a judge gives correct instructions on consciousness of guilt and correct instructions on deliberate premeditation, there is no need to further instruct the jury as to limitations on the

---

[4]The defendant also claims error in the judge's characterization of "malice aforethought" as an "unlawful murderous frame of mind." We have previously noted that such language is not helpful. See *Commonwealth* v. *Eagles*, 419 Mass. 825, 836 (1995). However, where malice has been defined by reference to the prongs of malice, such "extraneous comments in the malice instructions" do not give rise to a substantial likelihood of a miscarriage of justice." *Id.* at 837. And, as discussed above, the deliberate premeditation instruction itself would effectively convey to the jury the requirement that the Commonwealth prove a specific intent to kill in order to convict the defendant on a theory of deliberate premeditation.

use of consciousness of guilt with respect to the issue of premeditation." *Id.* at 844. The judge's failure to give such an instruction here does not constitute error.[5]

iii. *Other claims of error in instructions.* The defendant also complains that the judge gave a standard instruction on identification when the issue of identification had been conceded from the outset. He contends that that instruction, which characterized identification as "a crucial issue" and "one of the most important issues" in the case, distracted the jury from the issue that was critical to the case, namely, the defendant's state of mind at the time of the shooting. Notwithstanding any concessions by the defense, it was incumbent on the Commonwealth to prove beyond a reasonable doubt that the defendant was the one who had committed this crime. See *Commonwealth* v. *Murray*, 396 Mass. 702, 709 (1986). To that end, the Commonwealth had introduced evidence of Barros's show-up identification of the defendant, and it was appropriate for the judge to instruct the jury on how to evaluate that evidence. While the use of such terms as "crucial" or "most important" issue could have been omitted, we see no likelihood that those terms would have caused the jury to overlook the state of mind issues that had been contested and argued to them extensively throughout the trial.

The defendant argues that the judge impermissibly intruded on the fact-finding role of the jury when he used illustrations and examples that were "readily identified to the facts of the case." Here, as in *Commonwealth* v. *Moses*, 436 Mass. 598, 603-604 (2002), the judge identified his examples and illustrations as such and emphasized to the jury that they were the "sole and exclusive judges of the facts." He also advised them, at various points, that he was expressing no opinion on the merits of the case and that they were to disregard any words or gestures of his that they might interpret as indicative of his opinion. Viewing the instructions as a whole, we are satisfied

---

[5] In light of our conclusions with respect to the claimed instructional errors on the deliberate premeditation theory of murder in the first degree, we need not consider the defendant's claims of error with respect to the instructions on the alternative theories of extreme atrocity or cruelty and felony-murder. See *Commonwealth* v. *Caputo*, 439 Mass. 153, 168 (2003); *Commonwealth* v. *Chipman*, 418 Mass. 262, 270 n.5 (1994).

that the judge did not inject his opinions of the evidence into his instructions.

b. *Ineffective assistance of counsel.* The defendant argues that his trial counsel rendered ineffective assistance in many different respects. Some of his claimed theories of ineffectiveness are argued based on the existing record. On his other theories (addressed in the next section), he claims that the judge should have held an evidentiary hearing. We find no merit to the claims of ineffective assistance.

In reviewing capital cases for ineffective assistance of counsel, we apply a broad standard of review and determine whether there is a substantial likelihood of a miscarriage of justice. G. L. c. 278, § 33E. See *Commonwealth* v. *Arriaga*, 438 Mass. 556, 581 (2003). "[W]e consider whether there was error in the course of the trial and, if so, whether that error was likely to have influenced the jury's decision." *Commonwealth* v. *Fisher*, 433 Mass. 340, 354 (2001), citing *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992). A strategic decision by an attorney, however, constitutes error "only if it was manifestly unreasonable when made." *Commonwealth* v. *Frank*, 433 Mass. 185, 190 (2001), quoting *Commonwealth* v. *Coonan*, 428 Mass. 823, 827 (1999). We recognize that " '[t]hroughout the course of a trial, defense counsel is called on to make numerous tactical decisions,' and therefore, '[a] list of subjective critiques of defense counsel's decisions, absent a showing that errors likely affected the jury's conclusions, is insufficient to support an ineffective assistance claim.' " *Commonwealth* v. *Horton*, 434 Mass. 823, 831 (2001), quoting *Commonwealth* v. *Fisher*, *supra* at 354. We consider each of the defendant's claims of ineffective assistance under these standards.

The defendant contends that trial counsel made inappropriate concessions at trial. Specifically, the defendant highlights portions of counsel's opening statement and closing argument, asserting that the concessions of the defendant's guilt "help[ed] the prosecution prove its case" and that counsel "failed to perform his duty as zealous advocate and to subject the government's case to meaningful adversarial testing." Where, as here, the evidence implicating a defendant is strong, we have found no error in strategic concessions of guilt, even in a

prosecution for murder in the first degree. See *Commonwealth v. Arriaga, supra,* and cases cited. In the present case, the evidence that the defendant killed Spence was overwhelming — he was followed from the scene directly to the location where he was found in possession of the murder weapon, he was then identified by an unbiased eyewitness, and he ultimately gave a confession (recorded verbatim) in which he admitted that he had shot the victim. Given the circumstances of the shooting (five shots at point blank range, with no evidence of mitigation or justification), the evidence of malice was also overwhelming. Those same circumstances provided the Commonwealth with compelling evidence of deliberate premeditation, and Rice's testimony about the attempted robbery (testimony corroborated by Barros's observations of the defendant wearing a mask), gave the Commonwealth strong evidence for the alternative theory of felony-murder.[6] Given this potent incriminating evidence against the defendant, trial counsel presented the only possible defense, effectively conceding murder in the second degree while attempting to cast doubt on the theories of murder in the first degree. On these facts, it was not manifestly unreasonable for counsel to concede that the defendant "was the person who had fired the shots" while asking the jury to focus on "what was in [the defendant's] mind when the incident occurred."

The defendant also argues that counsel inadequately advanced this defense strategy because he "did not expressly ask the jury to return a verdict of second degree murder." The fact that counsel did not expressly use the words "second degree" in his closing argument would not have influenced the jury's decision. Counsel consistently stressed the theme that the evidence did not support any of the theories of murder in the first degree, and that what was at issue in the case was one of "degree." For example, he pointed out that the defendant did not know the

---

[6]Although the Commonwealth had sufficient evidence to proceed on the theory of extreme atrocity or cruelty, making that alternative available as well, that theory of murder in the first degree was not as conclusively established as the other two theories. While certain of the factors articulated in *Commonwealth v. Cunneen,* 389 Mass. 216, 227 (1983), were present here, it was undisputed that the victim had rapidly lost consciousness and had succumbed soon thereafter.

victim, to indicate the randomness of the crime and thereby negate premeditation; he highlighted the suddenness of the crime, and the exceedingly small amount of time that elapsed during the shooting, again to counter the theory of deliberate premeditation; he argued that there was no evidence that the victim had suffered for any extended period of time, to counter the theory of extreme atrocity or cruelty; and he stressed weaknesses in the evidence concerning the mask, to cast doubt on the theory that the shooting had occurred during an armed robbery. Counsel urged the jury to conclude that "this boy is not guilty of first degree murder," and asked them to "show some consideration and some mercy as to the degree of what happened out there." Other than a verdict of not guilty (which counsel strategically did not argue to the jury), the jury's only option other than murder in the first degree was murder in the second degree, and counsel's avoidance of the words "second degree" in his summation would have no impact on the jury's assessment of the defense position.[7]

The defendant also contends that, during closing argument, counsel should have done more to challenge the credibility of the two witnesses who testified that the defendant had worn a ski mask at the time of the shooting. This criticism does not amount to ineffective assistance of counsel. With hindsight, one can always craft a more eloquent and forceful closing argument. However, "the guaranty of the right to counsel is not an assur-

---

[7]The defendant also argues that other statements made during closing argument (e.g., "it's clear that shooting another person with a .357 Magnum for no reason at all is not the way we live") undermined a potential theory of mitigation, and discredited the defendant's statement to the police that he had carried a gun out of fear and had shot Spence because Spence was reaching for something. This claim also lacks merit. The defendant's statement to the police — speculating that Spence's turning away from him might have been "to grab something" — was not sufficient to warrant an instruction on manslaughter. See *Commonwealth* v. *Groome*, 435 Mass. 201, 220 (2001), and cases cited (instruction on voluntary manslaughter appropriate if reasonable person would have been provoked). On appeal, the defendant does not contend that counsel was ineffective for failing to request a manslaughter instruction or to advance a claim of provocation. The strategic decision to pursue a theory of murder in the second degree, and to forgo a futile theory of manslaughter, was not manifestly unreasonable. Having made that strategic decision, it was also not manifestly unreasonable for counsel to distance himself from the strained version of events that the defendant had given the police.

ance to defendants of brilliant representation or one free of mistakes," *Commonwealth* v. *Arriaga supra* at 582-583, quoting *Commonwealth* v. *LeBlanc*, 364 Mass. 1, 13-14 (1973), and suggesting ways in which counsel's closing argument might have been stronger does not make out a claim of ineffective assistance. With respect to the issue whether the defendant had been wearing a mask at the time of the shooting, potential weaknesses in the evidence concerning the mask had repeatedly been illustrated during cross-examination. Counsel had succeeded in obtaining a retraction from Cavell Rice (who conceded that he had described only a "hat" during his grand jury testimony and ultimately acknowledged that he did not know "whether it was a hat or a mask"). During cross-examination of police witnesses, counsel had repeatedly pointed out that only a cap, and no mask, had ever been recovered. Counsel's closing argument exhibited no "inattentiveness" to this point, as he reminded the jury that no such mask had been introduced in evidence, and that the baseball cap that was introduced had no mask or material to cover the defendant's face. Based on that absence of physical evidence, counsel argued that "[t]here was no mask in this case." We see nothing manifestly unreasonable in opting to address the issue of the mask in this fashion rather than by reiterating points already made during cross-examination.

c. *Need for an evidentiary hearing.* With respect to other theories of ineffective assistance of counsel, the defendant contends that the motion judge should have held an evidentiary hearing before ruling on the motion for a new trial. The decision whether to hold an evidentiary hearing is committed to the discretion of the motion judge, and we review that decision for an abuse of discretion. *Commonwealth* v. *Goodreau, ante* 341, 348 (2004). The judge may rule on a motion for a new trial without an evidentiary hearing where the motion and supporting materials do not raise a "substantial issue." Mass. R. Crim. P. 30 (c) (3), as appearing in 435 Mass. 1501 (2001). In determining whether a motion for a new trial warrants an evidentiary hearing, both the seriousness of the issue itself and the adequacy of the defendant's showing on that issue must be considered. *Commonwealth* v. *Goodreau, supra,* and cases cited.

A claim of ineffective assistance of counsel, the claim asserted in this particular motion for a new trial, raises "an issue of constitutional importance" that readily qualifies as a serious issue. *Commonwealth* v. *Licata*, 412 Mass. 654, 661 (1992). Accordingly, our analysis whether an evidentiary hearing was required focuses on the adequacy of the showing made with respect to that serious issue. Although the motions and supporting materials filed by a defendant need not prove the issue raised therein, they must at least contain sufficient credible information to cast doubt on the issue. See *Commonwealth* v. *Goodreau, supra*; *Commonwealth* v. *Britto*, 433 Mass. 596, 608 (2001); *Commonwealth* v. *Licata, supra* at 662. Here, we find no abuse of discretion in the motion judge's assessment that the defendant's motion did not make an adequate showing with respect to any of the alleged instances of ineffective assistance of counsel.

i. *Failure to investigate, interview witnesses, or prosecute pretrial motions.* The defendant characterizes trial counsel's general preparation and investigative efforts as ineffective, and asserts that an evidentiary hearing should have been held to determine whether trial counsel strategically decided against interviewing witnesses and deliberately chose not to prosecute all of the pretrial motions filed on the defendant's behalf. While counsel certainly has "a duty to make reasonable investigations," counsel is also afforded the opportunity to "make a reasonable decision that makes particular investigations unnecessary." *Strickland* v. *Washington*, 466 U.S. 668, 691 (1984). In this case, the motion judge did not abuse his discretion in determining that the defendant failed to "indicate which, if any, witnesses [defense counsel] should have called," and failed to articulate how any additional investigation would have benefited his defense. The defendant's motion and supporting materials did not identify any information that might have been unearthed by further investigation, and there was no need for an evidentiary hearing on the issue.

The defendant also contended, and the motion judge agreed, that some of the pretrial motions filed by trial counsel contained erroneous facts and citations that were not apt to the defendant's

case.[8] However, while appropriately critical of counsel's carelessness in his written work, the judge correctly proceeded to analyze whether that carelessness had had any impact on the defense. The motion judge noted that, notwithstanding any inaccuracies in the motion papers, counsel had actively pursued the two critical pretrial motions through evidentiary hearings: the motion to suppress the defendant's statements to the police, and the motion to suppress Barros's identification of the defendant.[9] Before the motion judge and on appeal, the defendant has failed to specify how better drafting or more vigorous pursuit of any of the other motions would have yielded the defendant any advantage.[10]

ii. *Failure to seek suppression of the defendant's confession on the ground that he invoked his right to counsel.* The defendant asserts that trial counsel failed to pursue suppression of his confession on all theories available to him, contending that he had, both during the ride back to the police station and at the start of the tape recorded interrogation, invoked his right to counsel.[11] He claims that the motion judge should have held

[8]Some of the motions appeared to be copied from or based on motions that counsel had filed in other cases, and counsel had neglected to correct the names, dates, and facts to make the motion papers pertinent to this defendant's case.

[9]The defendant points out that the memorandum originally filed in support of the motion to suppress identification addressed the standards for photographic arrays, not the standards for a showup identification. However, the apparent misunderstanding about the nature of Barros's identification was straightened out well before the evidentiary hearing, and the evidentiary hearing on the motion to suppress identification squarely addressed the showup identification that Barros had made. The defendant points to no error in the trial judge's conclusion that that showup identification procedure, performed approximately one-half hour after the shooting, was permissible and fairly conducted, and thus fails to identify how a better memorandum of law on the issue might have helped the defense.

[10]Most of the other motions were repetitive "boilerplate" discovery motions. There was no showing in the defendant's motion that the Commonwealth had failed to provide him with appropriate discovery in response to those motions, nor any showing as to how additional discovery would have advanced the defense.

[11]As filed and litigated, the defendant's motion to suppress his statements had been based on the theories that he did not understand the Miranda warnings and that his statements had not been made voluntarily. The defendant's affidavit, submitted in support of that motion to suppress, made no mention of

an evidentiary hearing with respect to counsel's failure to pursue suppression on these additional grounds.

The defendant first contends that he invoked his right to counsel when he requested that the police contact his former high school guidance counsellor. That request was made to the officers while en route to the police station, during the course of conversation about their own friendships with personnel at that school. The officers honored the defendant's request when they telephoned the guidance counsellor's home and learned that he was out of town.[12] The theory of suppression now advanced was not a viable theory, and there was no error on counsel's part in failing to pursue that futile theory.

It is well established that when an individual in custody "states that he wants an attorney, the interrogation must cease until an attorney is present," *Miranda* v. *Arizona*, 384 U.S. 436, 474 (1966), and any subsequent questioning initiated by the police in the absence of counsel gives rise to the presumption that the suspect's statements were involuntary and therefore inadmissible. *McNeil* v. *Wisconsin*, 501 U.S. 171, 177 (1991). However, such a request for counsel must be clear. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." *Commonwealth* v. *Jones*, 439 Mass. 249, 258 (2003), quoting *Commonwealth* v. *Judge*, 420 Mass. 433, 450 (1995).

We agree with the motion judge that the defendant's request to contact his former guidance counsellor was not a clear and unambiguous request for counsel. The guidance counsellor was not an attorney, nor was there any suggestion that the defendant (or the officers) believed him to be an attorney. The defendant argues, however, that in the past, various teachers and school officials had assisted students who were "in trouble with the

---

any invocation of the right to counsel, or of any facts that would suggest such an invocation.

[12] In support of the motion for a new trial, the defendant submitted the affidavit of the guidance counsellor's son, who confirmed that the police had telephoned looking for his father, and that he had informed them that his father was away in Maine for the weekend.

law," in some instances helping them find lawyers. He contends that, through their own relationships with people at the school, the officers would have been aware of the school's "practice" and thus should have understood his request to contact someone at the school as a request for an attorney. The fact that someone who is not an attorney might at some point help a defendant find counsel does not transform every request to contact a non-attorney into an unambiguous invocation of the right to counsel. See *Fare* v. *Michael C.*, 442 U.S. 707, 719 (1979) (request to contact probation officer after arrest did not constitute invocation of right to counsel).[13] The motion judge did not abuse his discretion in refusing to hold an evidentiary hearing on this theory of ineffective assistance of counsel, as the proffered theory of suppression was patently lacking in merit.

The other theory of suppression that the defendant contends should have been raised by trial counsel was the claim that, at the initiation of his interrogation at the police station, the

---

[13]The defendant relies heavily on *Commonwealth* v. *Segovia*, 53 Mass. App. Ct. 184, 187-188, 191 (2001), in support of the proposition that a request to talk to someone other than an actual lawyer can constitute a request for counsel. In that case, the defendant spoke very little English, and, at the start of the interrogation, told the officer that he did not understand what was being said and that he wanted a friend of his, repeatedly identified as a "paralegal," to be present and to act as translator. His response to the administration of Miranda warnings was the same: that he could not understand them without the help of a translator. *Id.* at 190. Despite that response, the officer proceeded to question the defendant, whereupon the defendant again stated that he did not understand and that he wanted to wait until his friend, the paralegal, arrived. The officer then agreed to wait, but suggested that they go through "routine booking questions." However, instead of "routine booking questions," the officer proceeded to initiate a substantive discussion of the charges. *Id.* at 187. Later on during that discussion, the defendant said that he wanted a "legality," but the interrogation still continued. *Id.* at 188. While the Appeals Court opined that the request for a "paralegal," made by a person with extremely limited command of the English language, should have been treated as a request for counsel, *id.* at 191, the facts simultaneously revealed an invocation of the right to remain silent — the defendant told the officer, repeatedly, that he did not wish to talk until a translator arrived. The present case is readily distinguishable. This defendant requested that the police contact his guidance counsellor, not a paralegal or other person with any involvement in the provision of legal services; this defendant readily understood and communicated in English, understood his Miranda warnings, and was capable of articulating a request for counsel in straightforward language if he so chose; and this defendant never asked that the interrogation cease or be postponed until the guidance counsellor could be located.

defendant made two explicit requests for counsel, both of which were allegedly ignored. In his affidavit filed in support of his motion for a new trial, the defendant stated that Miranda warnings were given to him while the interrogation was being recorded; that, at the end of the warnings, he requested to have counsel present; that the interrogating officer told him he could not have counsel at that time; and that the officer then rewound the tape and started the interrogation over again. According to the defendant's affidavit, he made the same request for counsel again, the officer again refused to honor that request, and the tape was rewound yet again to start the interrogation over for a third time. At that point, the defendant gave up on his request for a lawyer and proceeded to answer the officers' questions. The defendant's affidavit claimed that during his first meeting with trial counsel after arraignment, he had advised trial counsel of these facts.[14]

Before deciding whether to hold an evidentiary hearing on this issue, the motion judge granted the defendant's request for funds to retain an expert who could examine the original tape for evidence that it had been rerecorded, thereby giving the defendant an opportunity to corroborate his claim with expert testimony. However, the expert found no such corroborating evidence. At a status hearing on the defendant's motion for a new trial, defense counsel conceded that although the expert had found an "electronic mark near the beginning of the tape," the expert could not render an opinion that it had been rewound, nor even an opinion that such a mark was "consistent" with a rewinding of the tape. No report from the expert was ever submitted.

The motion judge was therefore left with only the defendant's affidavit, which he characterized as an "unsubstantiated allegation" of wrongdoing by the police, made years after trial. A defendant's "self-serving affidavits and assertions are not sufficient, on their own, to raise a substantial issue." *Com-*

[14]Although his original affidavit in support of his motion to suppress made no mention of this alleged request for counsel or the alleged destruction of evidence, his affidavit in support of the motion for a new trial claimed that his earlier affidavit had been presented to him for signature moments before the start of the hearing and that he had signed that affidavit without reading it.

*monwealth* v. *Scoggins*, 439 Mass. 571, 578 (2003). See *Commonwealth* v. *Goodreau*, *ante* 341, 351 (2004), and cases cited. There was no abuse of discretion in the motion judge's refusal to hold an evidentiary hearing on an allegation supported only by the defendant's self-serving affidavit.

d. *Review under G. L. c. 278, § 33E.* We have reviewed the entire record as required by G. L. c. 278, § 33E, and conclude that there is no basis for ordering a new trial or directing the entry of a verdict of a lesser degree of guilt of the conviction of murder in the first degree.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*