COMMONWEALTH vs. PETER C. HODGKINS, JR.

Essex. January 7, 1988. — March 15, 1988.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, LYNCH & O'CONNOR, JJ.

*Practice, Criminal,* Arraignment. *Evidence,* Admissions and confessions, Videotape. *Rules of Criminal Procedure.*

There was no error in a judge's denial of a criminal defendant's motion to suppress a lengthy videotaped reenactment of the events which took place at the scene of a homicide on the ground that the reenactment, which started approximately six hours after his arrest and several hours after his confession, was obtained in violation of his right to be promptly arraigned where, based upon the judge's warranted findings, it appeared that the defendant voluntarily agreed to participate in the videotaped reenactment; that he was given Miranda warnings twice before the reenactment; and that he voluntarily signed a written waiver of prompt arraignment, after expressing concern that he did not want a morning appearance in a crowded courtroom where members of the press might be present. [875-878]

A defendant charged with first degree murder and armed assault with intent to rob was not denied his right to a fair trial as a result of the jury's being shown a videotaped reenactment of the crimes in which the defendant was wearing handcuffs. [878]

INDICTMENTS found and returned in the Superior Court Department on August 15, 1984.

Motions to suppress evidence were heard by *John T. Ronan, J.,* and the cases were tried before *Paul V. Rutledge, J.*

*Randolph Gioia* for the defendant.

*Elin H. Graydon,* Assistant District Attorney, for the Commonwealth.

HENNESSEY, C.J. The defendant appeals from his convictions in Superior Court of murder in the first degree and armed assault with intent to rob. We affirm.

During the evening hours of June 24, 1984, the victim, Anne Natti, spoke on the telephone with a friend (Linda) and

made plans to get together the next morning at Linda's house. At the time, Linda lived in Rockport, and Anne was living in Gloucester at a summer camp. A large wooded area with many trails, commonly known as Dogtown Common, separated the two residences. At noontime the next day, when the victim had not arrived at Linda's house, Linda alerted the victim's brother-in-law and the victim's husband, and Linda joined them in a search of the wooded area. The search culminated at approximately 7 P.M. when the victim's husband discovered the victim's body lying face down off the path, naked, with part of her yellow rain suit "tied" around her neck. A pile of her clothing, turned inside out, was nearby. The police were then called to the scene.

One of the police officers observed that the victim's head was in the leaves, "like it was pushed into the ground . . . [u]p to . . . both the ears." A plastic bag containing a dog leash was also found at the location.

At some point the investigation focused on the defendant (Hodgkins) because he was known to frequent the Dogtown Common wooded area. On Wednesday afternoon, June 27, 1984, Detective Sergeant Reardon of the Gloucester police received a telephone call from Hodgkins. Hodgkins asked Reardon to meet him in a wooded area in Gloucester a few miles from where the victim was found. Reardon met Hodgkins in the wooded area. Reardon persuaded Hodgkins to accompany him back to the Gloucester police station. At the station, the police asked Hodgkins to relate his activities of the previous several days. Hodgkins told the police that on Saturday and Sunday he had been riding a "trail bike" (a motorcycle) in the Dogtown Common wooded area. He said that on Monday morning, June 25, 1984 (the day of the homicide), he awoke at approximately 8:30 A.M. at the home of a friend, Brian Langley. Hodgkins said that he then borrowed Langley's ten-speed bicycle and rode around Gloucester. He stopped at the local unemployment office and returned to Langley's home at approximately 2 P.M., where he remained for the rest of the day.

After speaking with Hodgkins, the police talked with Langley. Langley told the investigators, and testified at trial,

that Hodgkins had borrowed his trail bike, not the ten-speed bicycle, on Monday, June 25, 1984, and had left Langley's house with it at approximately 6:45 A.M. Hodgkins had repaired the trail bike a week earlier and had been riding it almost daily since that time. When Langley returned home from work with a friend at approximately 5 P.M., Hodgkins was not there. Langley did not check to see if the trail bike was in the garage. Hodgkins arrived a short time later. Hodgkins told Langley not to use the trail bike because the police had stopped him and told him that, because the bike did not have a license plate, they would arrest anyone who rode the bike again. The trail bike was in fact unregistered and uninsured. On Tuesday evening, June 26, Langley gave Hodgkins a ride to the Route 128 overpass on Route 133. During the ride Hodgkins was "scrunching down on the floor" by the front passenger seat. Hodgkins explained that he thought the police were looking for him because he had assaulted his girlfriend. When they arrived at the overpass Hodgkins slowly began leaving the automobile but quickly returned to the front seat floor when he thought he heard sirens. Hodgkins eventually left the automobile and Langley observed him walk into the woods. Langley did not see Hodgkins again until the trial.

On Wednesday evening, June 27, Langley gave the police permission to search his home and garage. Pursuant to the search, the police seized Langley's trail bike and certain items of clothing belonging to Hodgkins. Later that same evening a police chemist conducted orthotolidine tests on Langley's trail bike, and the tests indicated traces of blood on the ignition key, handle grips, and other parts of the vehicle.[1]

While the police were searching Langley's garage, Hodgkins telephoned Langley. Langley gave State Trooper Mark Lynch permission to listen to his conversation with Hodgkins on an extension. During the conversation, Hodgkins asked Langley if he had told the police that Hodgkins had used Langley's trail bike on Monday and whether the police had checked the

---

[1] Subsequently, after Hodgkins was arrested, further tests revealed traces of blood under his fingernails.

tires. When Langley told Hodgkins that the police had examined the trail bike, Hodgkins expressed his displeasure: "that's one hole they got on me." Hodgkins told Langley not to let the police take the trail bike. Hodgkins also asked whether the police had checked the green trash bags which contained his clothing and also inquired about a box which contained a BB pistol. Hodgkins told Langley that he knew well the area where Anne Natti was found, and he thought the police were trying to pin the murder on him. Later the same evening Hodgkins called Langley again to express his fear of a shootout. When Langley asked Hodgkins if he had murdered Anne Natti, Hodgkins said he had not.

On Thursday, June 28, 1984, at approximately 2 A.M., a murder warrant was issued for Hodgkins. In the early morning hours of Thursday, the police attempted to arrest Hodgkins at the Gloucester docks, where he was working, but Hodgkins failed to show up for work. Thereafter, police began an extensive search of the Dogtown Common woods. The search failed to locate Hodgkins.

On Friday, June 29, 1984, at approximately 9 A.M. Hodgkins surrendered at the Gloucester police station. He had been persuaded to surrender by an acquaintance he had met earlier that morning while hiding in the woods. Hodgkins told this acquaintance that the police were looking for him (Hodgkins) because they thought he had murdered a woman. Hodgkins had not been accused by the police of the murder when he made this statement. He had been hiding in the woods since Wednesday afternoon and had not eaten.

Hodgkins was brought into a lieutenant's office where Corporal Karl Sjoberg (Sjoberg) read him his Miranda rights. At approximately 9:07 A.M. Sjoberg observed Hodgkins read and sign the card with the printed Miranda warnings. Reardon then asked Hodgkins if he wished to make a telephone call. Hodgkins did not. Hodgkins then told Reardon and Sjoberg what happened on June 25, 1984. As Hodgkins spoke, Reardon asked the questions, and Sjoberg transcribed the statement by hand. Hodgkins gave a detailed account to the officers. He stated that he was in the woods riding Langley's trail bike when

he first saw Anne Natti walking her dog. He described the crime scene and the victim's clothing, including her rubber slicker and pants and her rubber boots. He stated that he followed her along the path, pushed her down and hit her in the back of the head with a rock.[2] He then half-walked and half-carried her into the woods. He checked her pockets, looking for money. He saw a dog's leash wrapped up in a little plastic bag. He did not remember taking her clothes off, but he also stated that he slipped her clothes off, although he did not know that he had done so. He stated that he thought about raping her when he took her clothes off, and admitted having sexual fantasies when he was in the woods, but denied raping her. He did not punch her but may have hit her in the face with a rock. He did not plan the attack; it just happened. He panicked and in his panic ran through the woods and became lost but finally located the trail bike. After he finished his statement, Hodgkins read it, made some changes and then signed it. During Hodgkins's statement, Sjoberg noted that Hodgkins appeared to be coherent and lucid. Sjoberg did not have any trouble understanding him. Reardon, who had known Hodgkins for many years, observed that during his statement "Peter appeared to be Peter." The initial police questioning lasted for approximately two hours.

Hodgkins does not challenge the admissibility of the morning confession at the police station. He concedes that the motion judge was warranted in finding that the confession was voluntary.[3] He now focuses his challenge solely on a videotaped

---

[2] Autopsy later showed multiple fractures of the head and face of the victim.

[3] Hodgkins filed various motions to suppress his confessions and admissions and these, after hearing, were denied by a Superior Court judge as follows: "For whatever reason of subjective motive that he might have had or that then possessed him, Hodgkins freely decided to tell the police the story that he, in fact, advanced on Friday morning, June 29th. Moreover, the election to talk was not only voluntary in so far as it is a question of fact, it is also knowledgeable and was a product of a rational mind. His, at that time and place, was not an intellect clouded by drugs, confused by alcohol, overborne by any physical exhaustion, or impaired by some anguish or pain of body or mind. While it is true that he was frightened by the prospect of being shot by his searchers or pursuers, it is important to note

reenactment which started approximately six hours after the defendant's arrest and several hours after Hodgkins's lengthy morning confession.[4] This videotape presentation was shown to the jury, after Hodgkins's motion to suppress the videotape was denied. Hodgkins contends that where there was a significant prearraignment delay, the sole purpose of which was to obtain Hodgkins's videotaped reenactment of the event at the crime scene, the reenactment was obtained in violation of his prompt arraignment rights and should have been suppressed.

Rule 7 (a) (1) of the Mass. R. Crim. P., as amended, 397 Mass. 1225 (1986), states in pertinent part: "(a) *Upon Arrest.* A defendant who has been arrested shall be brought before a court if then in session, and if not, at its next session. . . . If the judge or special magistrate finds that the defendant is indigent . . . and has not knowingly waived his right to counsel . . . the Committee for Public Counsel Services shall be assigned to provide representation for the defendant. The judge or special magistrate shall then arraign the defendant or shall set a time for arraignment."[5]

Rule 7 (a) (1) essentially codified existing Massachusetts case law. Prior to adoption of the rule in 1978, Massachusetts law required that an arrested person be brought before the court for arraignment as soon after arrest as was reasonably possible. *Commonwealth* v. *Dubois,* 353 Mass. 223, 226 (1967). *Keefe* v. *Hart,* 213 Mass. 476, 482 (1913). The reasonableness of

---

that the pursuit in fact was over and he had no such grounded fear in Reardon's office. He voluntarily discussed the case from the start with his interrogators. He was not kept from counsel or family. The interrogation period was relatively very brief."

[4] In its brief the Commonwealth brought to our attention that the judge did not charge the jury that, if they found that the defendant killed the victim in the course of an unarmed robbery, they should find the defendant guilty of second degree felony-murder. There was no error in the judge's failure to give this instruction, nor was defense counsel remiss in not requesting such an instruction, because it was not warranted by any view of the evidence.

[5] The language of the rule was changed by the 1986 amendment, after the time relevant in this case, but the changes are not material to the issues here.

the delay is to be decided on a case-by-case basis. *Commonwealth* v. *Banuchi,* 335 Mass. 649, 656-657 (1957).

The length of the delay in arraignment here is argued variously by Hodgkins as nine hours, six hours and several hours. In light of the judge's findings that the District Court was located in the same building as the police station where Hodgkins was interrogated, and that court was in session that morning, we think that the delay was unreasonable if it was contrived by the police as argued by Hodgkins.

Hodgkins's arguments fail, however, in light of the judge's findings, on evidence which warranted those findings, that Hodgkins voluntarily agreed to participate in the videotape reenactment; was given Miranda warnings twice before the reenactment; and voluntarily signed a written waiver of prompt arraignment, after expressing concern that he did not want to appear in the courtroom in the morning while it was crowded with people, including the press.[6] Based upon these findings,

---

[6] The relevant findings of the judge were as follows:

"20. . . . The prosecutor's office had recently acquired a video-taping device and they hoped to acquire a live, on-location statement from the defendant.

"21. Therefore, Reardon, with whom the defendant had established some rapport, [broached] the subject with Hodgkins. Hodgkins was willing to accommodate them, lead them to the scene, and point out the places and objects for them, all to be recorded on television. Then Reardon informed the defendant that he did have a right to be arraigned. That the law required that he be brought into court and charged with the crime promptly. He also told him that at his arraignment a lawyer would be appointed for him. Reardon added that Hodgkins was entitled, quote, 'to go right up there now.' It appears that the Gloucester Police Station is within the same general building complex as the District Court. At this point Peter manifested an increased interest and he wanted to know if there were a lot of people in the court and whether there would be media or press people there. He further expressed a desire to avoid any appearance in public. Reardon told him it could not be evaded, but that if he wanted to waive his right to a prompt arraignment and go to the scene for the video taping, then they would be going to court very much later in the day and not so many people would be around. Hodgkins said that this was his preference. Reardon then wrote out Exhibit 2. He gave it to the defendant, and the defendant signed it.

"22. Reardon took that Exhibit 2 away with him, and I infer that he showed it or displayed it to someone else in authority, because when he came back to Hodgkins he had Exhibit 3, a typed document, which he told

there was no error in the judge's allowing the videotape to be shown to the jury.

Hodgkins advances the additional argument that the video-tape prejudiced him by showing him in handcuffs. We have viewed the videotape, and we think in all the circumstances there was no such prejudice or unfairness as to require a new trial, considering especially that the event took place in a location where reasonable security measures would be expected. As we have noted in the context of courtroom security, *Commonwealth* v. *Brown,* 364 Mass. 471, 476 (1973), "[f]air trial by an impartial jury is not denied when the relevant factors are weighed to a sensible conclusion that safeguards are needed which, in the circumstances of the content and conduct of the case, will not bring the rationality of the process or its decorum below an acceptable level. The burden is on [the] defendant to show that the judge's decision in the matter [is] wrong, and an appellate court . . . will not reverse his decision . . . unless he is shown to have been arbitrary or unreasonable." In *Brown* no abuse of discretion was found in the judge's order that prisoners testifying in the case be shackled while in the court-room. The level of possible prejudice to Hodgkins flowing from his being handcuffed while recreating the crime on a videotape shown to the jury is not comparable to that present and allowed in *Brown.*

We have no uncertainty as to the correctness of our conclu-sions concerning the delay of arraignment and the admission in evidence of the videotape of the reenactment of the crime. If we had any such doubts, we would still grant no relief here because of the overwhelming evidence (apart from the vid-eotape reenactment) that Hodgkins committed this brutal mur-der, and that the crime was premeditated, committed with extreme cruelty and in the course of an attempted robbery by means of a deadly weapon. If error had been shown as argued by Hodgkins, it would clearly have been harmless beyond a reasonable doubt. Hodgkins voluntarily confessed to the details

Hodgkins that he, Hodgkins, should sign if he wanted to waive immediate arraignment. Hodgkins took the document, looked it over, and signed the same."

of the crimes, and his confession was corroborated by convincing circumstantial evidence which established his guilt (e.g., blood traces on the motorcycle and under Hodgkins's fingernails; his confessed knowledge as to the victim's clothing and the dog leash in a plastic bag found at the scene; the cumulative evidence of his consciousness of guilt).

We have reviewed the entire record pursuant to our duties under G. L. c. 278, § 33E (1986 ed.), and perceive no reason to grant any relief in our discretion under that statute.

*Judgments affirmed.*