NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11900

COMMONWEALTH  vs.  ROBERT McWILLIAMS.


Middlesex.      October 8, 2015. – February 12, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk,
& Hines, JJ.


Robbery.  Attempt.  Constitutional Law, Assistance of counsel.
    Practice, Criminal, Assistance of counsel, Motion to
    suppress, Admissions and confessions, Discovery,
    Defendant's decision not to testify, Prior conviction.
    Evidence, Admissions and confessions, Prior conviction,
    Identification.  Identification.



Indictments found and returned in the Superior Court
Department on October 25, 2011.

The cases were tried before Elizabeth M. Fahey, J., and
motions for a required finding of not guilty, for a new trial,
and for postconviction discovery, filed on March 13, 2014, were
considered by her.

The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


Timothy St. Lawrence for the defendant.
Crystal L. Lyons, Assistant District Attorney, for the
Commonwealth.

SPINA, J.  In this case, we address the question left open in Commonwealth v. Fortunato, 466 Mass. 500, 509 (2013): whether voluntary, unsolicited statements that are not the product of police questioning, made more than six hours after arrest, must be suppressed under the safe harbor rule established in Commonwealth v. Rosario, 422 Mass. 48, 56-57 (1996).  Robert McWilliams, the defendant, was convicted of robbery while armed and masked, occurring on July 7, 2011; and of attempted robbery, occurring on July 26, 2011.  On appeal, he argues that the judge erred by (1) denying his motion for a required finding of not guilty; (2) denying (without a hearing) his motion for a new trial, in which he asserted several claims of ineffective assistance of counsel; and (3) denying his motion for postconviction discovery.  For the following reasons we affirm the judge's rulings.

1.  Background.  The jury could have found the following facts.  On July 7, 2011, a bank located in the Kendall Square area of Cambridge was robbed at gunpoint of $2,614.

Prior to the robbery, Edward Grigoryants, an employee of a business located at One Broadway, the same building as the bank, was taking a smoking break around midday in the designated smoking area located in front of the bank.  He noticed a tall African-American man wearing a "doo rag" on his head, leaning against a column near the smoking section.  The man had broad

shoulders and short hair and was carrying a small black pouch. Grigoryants identified this man as the defendant in court. After two to three minutes, Grigoryants went back inside.

At 1:23 P.M., the bank's surveillance cameras show the defendant entering the bank. At the time, a customer, Marie Saint-Surin, the bank's assistant manager, and Kaltoum El Hafidi, a teller, were in the bank. The defendant was masked at the time, but El Hafidi still could see his eyes and part of his mouth and nose. The defendant approached the teller window. He pointed a "big black gun" at El Hafidi and said that he was sorry to scare her and that he was not going to hurt her, and demanded she give him the money. El Hafidi complied. Once the defendant received the money, he left the bank through the automated teller machine (ATM) room and removed his mask. Before the defendant left the bank, El Hafidi was able to observe that the defendant had a shaved head. The bank's surveillance camera showed the defendant leaving at 1:24 P.M. When he left the bank, the defendant turned right, heading in the direction of Third Street. A parking garage is located around the corner from Third Street, which is less than a one-minute walk from the bank. The garage also is accessible through One Broadway. Once the defendant left, Saint-Surin notified the police, who arrived within approximately five minutes. El Hafidi described the defendant as a tall, African-

American man who was "not too fat but a little skinny." He was wearing "sports clothes" including a "beige white" long-sleeve T-shirt. He was carrying a "big black gun" and a black bag. The customer also described the defendant as a tall man wearing a long-sleeve shirt and nylon wind pants carrying a black or navy bag. Saint-Surin described the defendant as an African-American man wearing a white top and pants with a white stripe on both sides.

On July 26, 2011, Grigoryants was taking another smoking break in the same area around midday. While he was smoking, Grigoryants recognized a man walking by him as the man who robbed the bank on July 7. The individual had the same body build, broad shoulders, and height; however, his hairstyle was different. He had dreadlocks as opposed to the short hair observed on July 7, and the dreadlocks appeared to be a wig. The defendant was carrying a small black pouch that was similar to the one the robber carried on July 7. Grigoryants followed the man a short distance and used his cellular telephone to take a photograph of the man's back.

Grigoryants went into the bank and showed the photograph to Michelle Garris, the teller-manager. He asked whether she recognized the individual in the photograph. Grigoryants told Garris that he believed that the man was the person who had robbed the bank on July 7. Because Garris had not been working

on the day of the robbery, she showed the photograph to El Hafidi.  Grigoryants asked El Hafidi if the man in the photograph was the same man who robbed the bank on July 7.  At first, El Hafidi was unsure the photograph depicted the same man because the man in the photograph had hair and a beard and was wearing sunglasses.  Grigoryants told El Hafidi and Garris that the individual in the photograph was currently outside the bank.  They were in the lunch room and from there they were able to see outside the bank.  At that time, El Hafidi saw the man walk by the front of the bank.  She entered the main part of the branch to get a better view.  The defendant was then sitting at a table about twenty-five feet away from the bank, facing the bank.  El Hafidi recognized him because of his race, his build, his gait, and how he was dressed.  Once she recognized the defendant, she said, "Oh my god, it's him."  She called to Saint-Surin and told her that someone had seen the person who had robbed them outside the bank.  Saint-Surin looked out the window but became frightened and only looked at him sidewise.  She was afraid to look at his face.  She knew it was the same person from July 7 because he was wearing the same type of outfit and had the same gait.  Garris telephoned the Cambridge police.

The police were given a description of the individual and told how he was believed to have committed a bank robbery earlier that month.  On receiving a dispatch, Officers Eric

Derman and Marlin Rivera proceeded to the scene, arriving within three minutes of Garris's telephone call to the police. Once they arrived, they observed the defendant and determined that he fit the description they had been given. Officer Derman approached the defendant from the front while Officer Rivera approached him from behind. He observed the defendant holding a black nylon "draw-string type" bag and saw an outline of what appeared to be a handle of a gun. After the defendant was handcuffed, Derman determined that the defendant's dreadlocks were a wig. The black bag that the defendant was holding contained a plastic handgun and a beard and mustache "disguise." At the time of his arrest, the defendant was wearing a white or light gray long-sleeve T-shirt, running pants with a white stripe down the side, and sunglasses. The gun was later determined to be a pellet gun. Detective Jack Crowley arrived on the scene after the defendant was handcuffed. Detective Crowley observed the defendant to be about six feet, two inches tall. He spoke with El Hafidi and asked her whether the person she saw outside the bank was the person who had robbed the bank on July 7. She said that she was "positively certain" that it was the person who had robbed her.

At the police station, Crowley conducted an interview with the defendant. The defendant claimed that he had been sitting outside the bank that day to get some fresh air. Sometime

later, after the interview ended, the defendant asked the booking officer if he could talk to Crowley because he needed a favor. The defendant asked Crowley to get his backpack that was locked to his bicycle. He said his eyeglasses were in the backpack, and he needed them to see. He told Crowley that the bicycle was at the entrance of a parking garage located in the same building as the bank, and that the key was with his other belongings in the police station. When Crowley went to retrieve the eyeglasses, he noticed that the garage had a surveillance camera. He made arrangements with the garage's property management company to obtain a copy of the surveillance video recording from July 7. The recording showed the defendant leaving the garage on July 7, two to three minutes after the bank robbery.

2. Motion for a required finding of not guilty -- attempted robbery. The defendant argues that the Commonwealth presented insufficient evidence to show an overt act that was near enough to completing the robbery to be punishable as an attempt and, therefore, his motion for a required finding of not guilty should have been allowed. We disagree.

When reviewing a motion for a required finding of not guilty, we view the evidence in the light most favorable to the Commonwealth. Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979). We must consider whether "any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 677, quoting Jackson v. Virginia, 443 U.S. 307, 318-319 (1979).

This court has interpreted the law of attempt for over one hundred years; however, the case law interpreting the language of G. L. c. 274, § 6, the general attempt statute, is not extensive.  The statute requires "a showing that the defendant, after preparing to commit the crime, has undertaken overt acts [with specific intent] toward fulfilling the crime that 'come near enough to the accomplishment of the substantive offence to be punishable.'"  Commonwealth v. Bell, 455 Mass. 408, 412 (2009), quoting Commonwealth v. Peaslee, 177 Mass. 267, 271 (1901).  In order for a defendant to be guilty of attempt, the distance between his or her actions and the completed crime must be "relatively short" and "narrow."  Bell, supra at 415, quoting Commonwealth v. Hamel, 52 Mass. App. Ct. 250, 258 (2001).

There are two categories of attempt.  Bell, 455 Mass. at 412-413, quoting Peaslee, 177 Mass. at 271-272.  The first and most obvious form of attempt occurs when a person performs the last act required to complete a crime, but for some unanticipated reason, his or her efforts are thwarted, whether by bad aim or a mistake in judgment.  Bell, supra at 412-413, quoting Peaslee, supra at 271.  The second, and more complicated category, occurs when a person is still in preparatory mode and

has not committed the last act necessary to achieve the crime.
Bell, supra at 413, quoting Peaslee, supra at 271-272. "That an
overt act although coupled with an intent to commit the crime
commonly is not punishable if further acts are contemplated as
needful, is expressed in the familiar rule that preparation is
not an attempt." Peaslee, supra at 272. However, certain
preparations may be enough to support a conviction of attempt.
"It is a question of degree. If the preparation comes very near
to the accomplishment of the act, the intent to complete it
renders the crime so probable that the act will be a [crime]
although there is still a locus penitentiae[1] in the need of a
further exertion of the will to complete the crime. . . . [T]he
degree of proximity . . . may vary with circumstances . . . ."
Id. Certain factors must be considered when determining whether
acts constitute mere preparations or are enough to establish the
crime of attempt. Bell, supra at 414. These factors include
the gravity of the crime, the uncertainty of the result, and the
seriousness of harm that is likely to result. Bell, supra at
414, citing Commonwealth v. Kennedy, 170 Mass. 18, 22 (1897).

In this case, we are dealing with the second category of
attempt. Here, the defendant was still at the preparatory stage
and had not yet performed the last act necessary to commit the

---

[1] Locus penitentiae is an opportunity for changing one's
mind or undoing what has been done. See Black's Law Dictionary
1083 (10th ed. 2004).

crime of armed robbery. The defendant argues that he still had much to do before an armed robbery could be completed and that, although the evidence indicated he was prepared to rob the bank, it did not rise to the level of an overt act that puts him near the commission of a crime. We conclude that the evidence was sufficient to convict the defendant of attempted robbery.

The defendant was seen sitting twenty-five feet away from the bank he had robbed three weeks earlier. He was close enough to the bank that Saint-Surin and El Hafidi were able to identify him as the man who had robbed the bank on July 7. Seated just outside the bank, the defendant had the then-present ability to walk into the bank and rob it. His intention to rob the bank was supported by strong evidence. He was wearing the same clothing as he did on July 7, a long-sleeve white or light-colored shirt and running pants, during the midday hours in the scorching July heat. He had disguised himself by donning a wig. The black bag the defendant was holding, a bag that was similar to the one used in the robbery three weeks prior, contained a mustache and beard as well as a pellet gun. He was in close proximity to the bank and it could be inferred from these facts that he had the present intent to commit an armed robbery. The only actions left for the defendant to do before actually robbing the bank were to put on the beard and mustache, walk into the bank and up to the counter and demand money. The

evidence supports findings that the defendant had the present intention to rob the same bank he had robbed earlier that month, that he made preparations to do so, and that he had taken steps which put him in close proximity to completing the substantive crime.  He had undertaken overt acts which, although not the final act in a necessary sequence, were so close to the commission of the crime that a reasonable jury could conclude that it was virtually certain that he would have robbed the bank a second time had Grigoryants not recognized him and alerted bank personnel who then summoned police.  See Peaslee, 177 Mass. at 271-272.

Reference to the factors articulated in Kennedy, 170 Mass. at 22, supports our decision.  The first factor, seriousness of the crime, is readily satisfied.  Armed robbery is a felony punishable up to life in prison.  The second factor, uncertainty as to whether the defendant was going to complete the crime, was low.  The defendant had in his possession all the necessary materials to rob the bank, he had robbed the same bank three weeks before, and when he was apprehended he was sitting in front of the bank in the same area where he had been standing immediately prior to the robbery on July 7.  The third factor, the seriousness of the harm that would have been done had the defendant completed the crime, was substantial.  The defendant was armed with a pellet gun that could cause serious injury to a

person if fired.  The trial judge's decision to deny the motion for a required finding of not guilty was correct.

3.  <u>Ineffective assistance of counsel -- motion to suppress statements</u>.  The defendant argues that the judge erred in denying his motion for a new trial, which alleged that trial counsel had been ineffective for failing to file a motion to suppress statements the defendant made to police more than six hours after his arrest, in violation of the safe harbor rule established in <u>Rosario</u>, 422 Mass. at 56-57.  Further, the defendant argues that the bicycle and the surveillance video recording from the garage were fruits of those statements, and trial counsel should have moved to suppress them as well.  It is undisputed that the defendant's statements were made more than six hours after his arrest and that they had been volunteered. We turn to the question left open in <u>Fortunato</u>, 466 Mass. at 509:  whether volunteered, unsolicited statements made six hours after arrest and before presentment require suppression.  We conclude that they do not.

To show that counsel was ineffective, a defendant must first show that "there has been serious incompetency, inefficiency, or inattention of counsel" and behavior that falls "measurably below that which might be expected from an ordinary fallible lawyer."  <u>Commonwealth</u> v. <u>Saferian</u>, 366 Mass. 89, 96 (1974).  If the defendant is successful in proving the first

prong, he then must show that counsel's omission "has likely deprived the defendant of an otherwise available, substantial ground of defence."  Id.

Rule 7 (a) (1) of the Massachusetts Rules of Criminal Procedure, as appearing in 442 Mass. 1506 (2004), requires the prompt presentment of an arrestee before a court.[2]  The purpose of the rule is to discourage unlawful detentions, unlawfully obtained statements, and improper police pressure.  Commonwealth v. Powell, 468 Mass. 272, 276-277 (2014).  The rule essentially codified the existing case law.  Rosario, supra at 51.  Our case law requires that an arrestee be brought before a judge as soon as reasonably possible.  Commonwealth v. Hodgkins, 401 Mass. 871, 876 (1988), and cases cited.  Before Rosario, the unreasonableness of a delay was determined on a case-by-case basis in light of all the circumstances.  Powell, supra at 277. Commonwealth v. Perito, 417 Mass. 674, 680 (1994), and cases cited.  This case-by-case approach continued, without suppression of any evidence by reason of undue delay in presentment, until Rosario.  Powell, supra at 278, citing Rosario, 422 Mass. at 52.

In Rosario, this court announced a bright line rule

---

[2] Rule 7 (a) (1) of the Massachusetts Rules of Criminal Procedure, as appearing in 442 Mass. 1506 (2004), states:  "A defendant who has been arrested shall be brought before a court if then in session, and if not, at its next session."

stating, "[a]n otherwise admissible statement is not to be excluded on the ground of unreasonable delay in arraignment, if the statement is made within six hours of the arrest (day or night), or if (at any time) the defendant made an informed and voluntary written or recorded waiver of his right to be arraigned without unreasonable delay." Rosario, 422 Mass. at 56. Exceptions may apply in the rare case of a natural disaster or emergency. Powell, 468 Mass. at 276. Rosario, supra at 56-57. The six-hour rule has several goals. First, it serves to provide clarity and consistency to police officers, judges, prosecutors, and defense counsel as to the "right of the police to question" an arrestee as well as the "standard for suppressing statements" made due to an unreasonable delay before arraignment. See Commonwealth v. Morganti, 455 Mass. 388, 399 (2009), S.C., 467 Mass. 96, cert. denied, 135 S. Ct. 356 (2014), quoting Rosario, supra at 53. Second, the rule is "intended to facilitate a criminal defendant's right to counsel, to ensure that a defendant receives a prompt statement by a judge or magistrate of the charges against him, and to prevent unlawful detention." Fortunato, 466 Mass. at 506. Third, it is a "prophylaxis against dilatory police conduct," seeking to prevent unlawful detentions and improper police pressure. Commonwealth v. Siny Van Tran, 460 Mass. 535, 561 (2011). See Powell, supra at 279 ("A bright-line rule . . . achieves the

goal of limiting the coercive effect of lengthy arraignment delays"); Commonwealth v. Santana, 465 Mass. 270, 287 (2013). "[T]he principal mischief that the Rosario rule was adopted to prevent [was] the coercive influence of intentional delays of arraignment to prolong custodial interrogation of unwilling and uncounseled arrestees." Siny Van Tran, supra at 563.

Unlike in Rosario and Fortunato, the defendant's statements in this case were not in response to police questioning. Unlike in Fortunato, the defendant and Detective Crowley did not have a conversation about the robbery after the safe harbor period expired. See Fortunato, 466 Mass. at 502-503. The conversation here consisted solely of the defendant's volunteered, unsolicited request of Crowley that Crowley retrieve his eyeglasses. The fact that Crowley followed the defendant's directions to locate his bicycle and, in the process, noticed that there were security cameras at the garage was not a product of questioning about any crime. "[T]he mere passage of six hours," absent any direct or indirect efforts by the police to prompt the defendant to speak about the robbery or engage him in conversation likely to lead to the subject of the robbery, does not violate the safe harbor rule. See Commonwealth v. Perez, 577 Pa. 360, 372 (2004). Furthermore, in one of the rare instances where this court found an exception to the Rosario six-hour rule, we determined that Rosario did not apply to

defendants arrested outside of Massachusetts because the "spirit" of Rosario was not violated. Morganti, 455 Mass. at 399-400 (interrogating officer flew from Massachusetts to California). The "spirit" of Rosario is to prevent police officers desirous of obtaining a confession from purposefully delaying a defendant's arraignment. Morganti, supra. As in Morganti, the spirit of Rosario was not violated in this case. Crowley did not engage in conduct that could be characterized as a subterfuge intended to thwart the spirit of Rosario.

The goal of Rosario's safe harbor rule will not be furthered by automatic suppression of volunteered, unsolicited statements made by this defendant after the expiration of the six-hour safe harbor rule. The exclusionary rule was created to give protection to arrestees from the potentially coercive environment resulting from police questioning. See Commonwealth v. Duncan, 514 Pa. 395, 404 (1987), overruled by Perez, supra at 367-368, 372. Here, there was no police misconduct that offended a policy the exclusionary rule was meant to safeguard. Instead, suppression would only hinder legitimate information gathering. We conclude that a motion to suppress the statements and the fruits thereof would not have succeeded and, therefore, trial counsel was not ineffective. Commonwealth v. Comita, 441 Mass. 86, 91 (2004).

4. Motion for postconviction discovery. The defendant

argues that his request for all records relating to his booking and detention at the Cambridge police department would likely uncover evidence that would warrant granting him a new trial, and that therefore it was error to deny his motion for postconviction discovery.  We disagree.  "Where affidavits filed by the moving party . . . establish a prima facie case for relief, the judge . . . may authorize such discovery as is deemed appropriate."  Mass. R. Crim. P. 30 (c) (4), as appearing in 435 Mass. 1501 (2001).  Because we have determined that volunteered, unsolicited statements made after the Rosario six-hour rule has expired are admissible, the defendant has not established a prima facie case for relief.

5.  Ineffective assistance of counsel -- identification. The defendant argues that the judge erred in denying his motion for a new trial, which alleged that counsel was ineffective for failing to file a motion to suppress the identification evidence.[3]  He contends that El Hafidi's pretrial identifications were made in circumstances "especially suggestive," Commonwealth v. Jones, 423 Mass. 99, 109 (1996), "so as to give rise to a very substantial likelihood of a mistaken identification."

---

[3] The defendant argues that trial counsel should have moved to suppress the following identifications:  (1) Kaltoum El Hafidi's identification of the defendant based on the cellular telephone photograph; (2) El Hafidi's identification of the defendant sitting outside the bank on July 26, 2011; (3) El Hafidi's identification given to Detective Jack Crowley; and (4) El Hafidi's in-court identification of the defendant.

Commonwealth v. Moon, 380 Mass. 751, 758 (1980).  He also argues that her in-court identification was tainted by her suggestive pretrial identifications.

The defendant argues that El Hafidi's pretrial identifications, which did not involve the police, should be suppressed under common-law principles of fairness articulated in Jones, supra at 108-109.  Jones explains that "[c]ommon law principles of fairness dictate that an unreliable identification arising from the especially suggestive circumstances [that did not involve State action] should not be admitted."  Id. at 109. The court did not define the term "especially suggestive."  We recently have said that, where a judge finds an identification to be especially suggestive, a judge must "weigh[] the probative value of the identification against the danger of unfair prejudice, and determin[e] whether the latter substantially outweighs the former."  Commonwealth v. Johnson, 473 Mass. (2016).  The "ultimate measure," id. at    , in the analysis always will be "reliability."  Id. at    .  We also said that the especially suggestive standard "need not be set so high" as the unnecessarily suggestive standard applicable to out-of-court identification procedures conducted by the police because an unnecessarily suggestive identification procedure requires suppression, whereas one that is especially suggestive "simply triggers a reliability analysis."  Id. at    .

To trigger a reliability analysis, "the circumstances surrounding the identification need only be so suggestive that there is a substantial risk that they influenced the witness's identification of the defendant, inflated his or her level of certainty in the identification, or altered his or her memory of the circumstances of the operative event.  Where the independent source of an identification is slim, this level of suggestiveness may be sufficient to support a finding of inadmissibility; where the independent source is substantial, a greater level of suggestiveness would be needed to support a finding that the danger of unfair prejudice substantially outweighs the probative value of the identification."  Id. at    .

The defendant first contends that El Hafidi's identification of the defendant from the cellular telephone photograph was highly suggestive because Grigoryants asked her whether the photograph depicted the robber.[4]  There is no

---

[4] The defendant cites Commonwealth v. Day, 42 Mass. App. Ct. 242 (1997), to bolster his argument that Edward Grigoryants's photograph was unnecessarily suggestive.  In Day, two eyewitnesses were waiting in a room at the police station, alone, with a flyer that bore an image of the defendant's face and said that the defendant had been in an altercation at a bar, the same incident that occasioned the witnesses to go to the police station.  Id. at 244.  The witnesses subsequently identified the defendant's photograph from an array with six photographs.  Id. at 244, 249.  The Appeals Court held that the out-of-court identifications should have been suppressed.  Id. at 250.  These identifications were far more suggestive than El

evidence that Grigoryants did anything to pressure El Hafidi to confirm his suspicion.  Witnesses often are shown an individual at a showup who matches a description of a suspect.  Commonwealth v. Watson, 455 Mass. 246, 252-253 (2009), quoting Commonwealth v. Phillips, 452 Mass. 617, 628 (2008).  Showups are disfavored because they are "inherently suggestive."  However, it is only when showups conducted by the police are "unnecessarily suggestive" that the resulting identification must be suppressed.  Phillips, supra at 627, quoting Commonwealth v. Martin, 447 Mass. 274, 279 (2006).  El Hafidi's identification of the photograph was made in circumstances comparable to a permissible showup conducted by a police officer.  Had the showup been conducted by a police officer, it would not have been deemed unnecessarily suggestive.  If the identification procedure was not "unnecessarily suggestive," see Johnson, 473 Mass. at    , had it been conducted by the police, it could not have been "especially suggestive" because it was conducted by a third party, as here.  See id. at    .  Moreover, there was "good reason" to do it in the circumstances.  See Martin, supra at 282-283.  It was important to ascertain whether the defendant was the robber from July 7 while he was just outside the bank, so the police could be summoned if he were.

---

Hafidi's identifications, and we add that there was some, though minimal, government involvement in Day.

The record also supports a finding that El Hafidi relied solely on her experience from July 7, when she was only a few feet from the individual who robbed her, to identify the defendant.  When Grigoryants showed her the photograph, which depicted the defendant from behind, she expressed doubt that he was the July 7 robber because the man depicted in the photograph had a hairstyle different from the July 7 robber.  She did not identify the defendant as the man in the photograph at that time.  Whatever suggestiveness Grigoryants may have imparted was not so high that the danger of unfair prejudice outweighed the probative value of her identification, where that identification was substantially grounded in El Hafidi's experience with the robber on July 7.  It was not until she saw the defendant walking and ultimately sitting outside the bank, and drawing upon the observations of his gait, build, and race, which she had made during the July 7 robbery, that she was sure that he was the same man who robbed her on July 7.

Additionally, the defendant does not argue that El Hafidi's description of him or the robber has changed over time, or that she previously had failed to identify the defendant -- factors we have said may be relevant when determining whether an identification is reliable in the totality of the circumstances. See Johnson, 473 Mass. at    .  El Hafidi consistently had described the defendant as the robber and even questioned the

photograph that Grigoryants showed her because she remembered the robber as having had shorter hair than the man in the photograph. There is no reason to consider El Hafidi's identifications to be unreliable so as to warrant suppression under Jones.

The defendant next contends that El Hafidi's identification of the defendant outside the bank was especially suggestive because the defendant was not under restraint and El Hafidi was in a predicament of either identifying the defendant as the robber or risking being robbed again. Further, the defendant argues that this identification was especially suggestive because it occurred at the same place and same time of day, while he was wearing similar clothing. The defendant's argument has no merit. The defendant controlled the circumstances in which he was identified. It was not scripted or orchestrated by anyone other than the defendant. Although he was exhibiting the same modus operandi as did the robber on July 7, this does not make the circumstances especially suggestive. The defendant was sitting, facing the bank and staring directly into it. El Hafidi, drawing from her experience on July 7, identified the defendant not only based on his clothing but also by his gait, build, and race -- features that she had ample time to observe on July 7. The identification was reliable.

There is no merit to the defendant's claim that El Hafidi's

viewing the police draw their weapons on the defendant reinforced her previous suggestive identifications. More compelling facts were presented in Commonwealth v. Walker, 421 Mass. 90 (1995). In that case the witness was working at a donut shop where she was robbed. Id. at 92. She telephoned the police and gave a description of the man who had robbed her. Id. at 92-93. About two weeks later, the same witness was working at another branch of the donut shop and a coworker called from the front of the store asking her to look at a customer. Id. at 93. When the witness did so, she saw the individual who she believed had robbed her two weeks before. Id. She telephoned the police, and when they arrived, she described the customer, who had left the store. Id. The police apprehended the defendant at a nearby subway station and brought him to the donut shop where the witness was working. Id. He was positioned outside the shop, in handcuffs, next to a police officer and a police vehicle. Id. The witness identified him as the robber. Id. The court held that the identification was not unnecessarily suggestive. Id. at 94-95. In the present case, the police did not bring the defendant to El Hafidi. She was inside the bank while the defendant was being arrested, and when the police asked her if it was the same individual, she said yes. This identification was not unnecessarily suggestive. She had already identified the defendant based on her experience

of being robbed three weeks earlier and merely repeated her identification to the police.

Finally, the defendant argues that El Hafidi's in-court identification was tainted by inadmissible out-of-court identifications.  As we have concluded above, her out-of-court identifications were reliable.  Her identification to the police in response to their question whether the defendant was the person who had robbed her on July 7 was not made under conditions that were unnecessarily suggestive.  It follows that her in-court identifications were not tainted.  See Commonwealth v. Collins, 470 Mass. 255, 262 (2014).  Because a motion to suppress likely would not have been successful, the defendant has failed to show that counsel was ineffective in the constitutional sense.[5]  Comita, 441 Mass. at 91.

---

[5] We note that trial counsel was successful in requesting eyewitness identification jury instructions that were more favorable than the typical jury instructions given at the time. See Commonwealth v. Rodriguez, 378 Mass. 296, 310-311 (1979) (Appendix), S.C., 419 Mass. 1006 (1995) (setting forth model jury instruction for eyewitness identification).  The defendant requested jury instructions from New Jersey.  The New Jersey model instructions on eyewitness identification were published in July, 2012, one month before the trial in this case commenced.  See Commonwealth v. Gomes, 470 Mass. 352, 357 n.10 (2015).  These instructions were drafted pursuant to the landmark decision in State v. Henderson, 208 N.J. 208 (2011), and they were pertinent to this court's decision and proposed model jury instruction in Gomes, supra.  Subsequent to our decision in that case, we approved and recommended the use of the final Model Eyewitness Identification Instruction, which replaced the provisional instruction in the appendix of Gomes, supra at 379-388, and which is very similar to the model jury

Finally, the defendant has not shown that even if El Hafidi's identifications should have been suppressed, there was a reasonable possibility that the verdict would have been different. See Commonwealth v. Pena, 31 Mass. App. Ct. 201, 205 (1991). There was other powerful evidence from which the jury could have convicted the defendant, including videotapes and photographs from the bank's surveillance camera and the parking garage camera from July 7, which depicted the robbery and the defendant, as well as the photograph that Grigoryants took with his cellular telephone. There was testimony from witnesses to the July 7 robbery who gave similar descriptions of the robber. There was evidence of the similarities in the defendant's actions, dress, transportation, and items on his person on both July 7 and July 26.

6. Ineffective assistance of counsel -- right to testify. The defendant argues that the judge erred in denying his motion

---

instruction in New Jersey. See Model Jury Instructions on Eyewitness Identification, 473 Mass. 1051 (2015); New Jersey Model Jury Instruction on Eyewitness Identification (rev. July 19, 2012), available at https://www.judiciary.state.nj.us/ pressrel/2012/jury_instruction.pdf [http://perma.cc/PYR6-9FWF]. The jury were instructed on the dangers of eyewitness identification and factors to consider when deciding what weight to give to identification testimony. The defendant, three years before our decision in Gomes, had the benefit of jury instructions that went well beyond the jury instructions typical of the time. See Gomes, supra at 357 (stating provisional jury instruction modeled after New Jersey model instruction "was considerably longer and more detailed than the Rodriguez instruction").

for a new trial because his trial counsel erroneously advised him that if he testified at trial, five prior convictions, including of two larcenies involving motor vehicles, two charges of knowingly receiving a stolen motor vehicle, and one charge of unlawful possession of a firearm, could be used to impeach him. The defendant argues that he chose not to testify because of trial counsel's incorrect advice, and therefore his waiver of his right to testify was invalid. The Commonwealth argues that the record contradicts the defendant's assertions. We agree with the Commonwealth.

In anticipation of the Commonwealth's resting the next day, the trial judge addressed the defendant's motion in limine to exclude evidence of the defendant's prior convictions. The judge was inclined to admit the evidence because she believed that the five prior convictions at issue were not time-barred under G. L. c. 233, § 21. Defense counsel agreed with the trial judge. The judge provisionally determined the prior convictions were not time-barred but asked both attorneys to do more research and stated that they would take up the issue the next day. The next day, when the judge addressed the issue again, the Commonwealth told the judge that it may be a "moot point" and deferred to defense counsel. Defense counsel agreed, explaining that he spoke with his client the night before and that he did not expect his client to testify.

We begin by stating that the five prior convictions pertinent to this case were all time-barred under G. L. c. 233, § 21. Because trial counsel agreed with the trial judge in her misinterpretation of G. L. c. 233, § 21, the defendant argues that he received ineffective assistance of counsel because he relied on the misinterpretation in deciding whether to testify. Although counsel misinterpreted G. L. c. 233, § 21, the defendant has failed to prove by a preponderance of the evidence "that, but for his counsel's erroneous advice concerning the admissibility of his [prior convictions], he would have testified in his own defense." Commonwealth v. Freeman, 29 Mass. App. Ct. 635, 642 (1990).

"The right to testify on one's own behalf . . . is fundamental." Commonwealth v. Smith, 459 Mass. 538, 550 (2011), quoting Commonwealth v. Degro, 432 Mass. 319, 335 (2000). In his motion for a new trial, the defendant submitted an affidavit explaining that on the evening after the motion in limine was discussed, trial counsel visited the defendant and told him that if he testified, he could be impeached with his prior convictions. The defendant claims that if the prior convictions were not introduced he would have testified at trial. If he had testified, the defendant would have testified that he did not rob the bank on July 7, 2011, and explained why the person on the surveillance tapes was not him, and that he did plan to rob

the bank on July 26, 2011, but "lost [his] nerve."  Trial counsel did not file an affidavit.  "It is not enough to say that counsel had discouraged him from testifying."  Commonwealth v. Lucien, 440 Mass. 658, 671 (2004).  "[A] motion judge may reject a defendant's self-serving affidavit as not credible."  Commonwealth v. Colon, 439 Mass. 519, 530 (2003), citing Commonwealth v. Grant, 426 Mass. 667, 673 (1998), S.C., 440 Mass. 1001 (2003).  See Commonwealth v. Smith, 456 Mass. 476, 481 (2010).

Based on the record, the defendant's credibility is called into question.  Before the motion in limine was discussed, defense counsel told the judge that the defendant was most likely not going to testify.  This decision was made before the provisional ruling to admit the prior convictions for impeachment.  When the issue was revisited the next morning, defense counsel explained that the discussion was moot because the defendant would not be testifying.  The record suggests that in deciding not to testify the defendant did not rely on trial counsel's advice regarding prior convictions.  Furthermore, it is highly unlikely that the defendant would have testified because doing so would have sacrificed his defense to the July 7 robbery in an effort to obtain a not guilty verdict on the July 26 attempted robbery charge.  The defendant's affidavit said he would have testified that he was planning to rob the bank on

July 26 but lost his nerve.  If he had testified to this, it would have damaged his case theory because admitting to the fact that he intended to rob the bank on July 26 would have lead the jury to believe that he was predisposed to robbing a bank.  This would have undermined his mistaken identity defense to the July 7 robbery.  We conclude that the defendant has failed to show that his decision not to testify was based on incorrect advice from counsel.

The defendant further argues that the judge erred in denying the defendant's motion for a new trial without an evidentiary hearing.  We disagree.  "The decision whether to hold an evidentiary hearing is committed to the discretion of the motion judge, and we review that decision for an abuse of discretion."  Commonwealth v. Denis, 442 Mass. 617, 628 (2004).  See Commonwealth v. Stewart, 383 Mass. 253, 257 (1981).  If no "substantial issue" is raised by the motion or the affidavits submitted, the judge has the discretion to decide postconviction motions without an evidentiary hearing.  See Denis, supra, quoting Mass. R. Crim. P. 30 (c) (3), as appearing in 435 Mass. 1501 (2001).  When considering whether a motion for a new trial warrants an evidentiary hearing, the judge must look to the "seriousness of the issue itself and the adequacy of the defendant's showing on that issue must be considered."  Denis, supra.  See Stewart, supra at 257-258.  In this case, the

defendant filed a motion for a new trial and submitted an affidavit written by the defendant, police reports, a motion to change counsel, and a motion in limine to exclude evidence of the defendant's prior convictions. The motion and supporting materials do not need to prove the issues raised; however, "they must at least contain sufficient credible information to cast doubt on the issue." Denis, supra at 629. The record does not contain facts that would require an evidentiary hearing by the judge. Where the motion judge was also the trial judge she "may use [her] 'knowledge and evaluation of the evidence at trial in determining whether to decide the motion for a new trial without an evidentiary hearing.'" Commonwealth v. Riley, 467 Mass. 799, 826 (2014), quoting Commonwealth v. Wallis, 440 Mass. 589, 596 (2003). The motion judge properly determined that an evidentiary hearing was not warranted.

7. Conclusion. For the foregoing reasons, we affirm the defendant's convictions of armed robbery and attempted robbery and the orders denying his motions for a required finding of not guilty, for a new trial, and for postconviction discovery.

So ordered.