NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-630

COMMONWEALTH

vs.

EMMANUEL T. BILE, JR.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

A Superior Court jury convicted the defendant of two counts of aggravated rape.[1]  The defendant now appeals from the denial of his motion for a new trial claiming, inter alia, that his trial counsel was ineffective in failing to file a motion to suppress text messages recovered from his cell phone.  Specifically, the defendant argues that the police, after seizing his phone without his consent, unreasonably delayed for forty days in obtaining a search warrant for his phone.  We

---

[1] On direct appeal, the defendant claimed error in the denial of his motion to suppress a recorded statement, jury selection, several evidentiary rulings, jury instructions, the prosecutor's closing argument, and the denial of his motion to continue.  In May 2020, a panel of this court affirmed his convictions.  See Commonwealth v. Bile, 97 Mass. App. Ct. 1120 (2020).

conclude that the defendant has demonstrated a likelihood that a motion to suppress would have been successful because the police's delay in obtaining a warrant was unreasonable given the defendant's strong possessory interest in his phone.  We also conclude that there is a reasonable probability the verdict would have been different had the text messages retrieved from the defendant's cell phone been excluded from his trial. Accordingly, we reverse and remand for a new trial.[2]

Background.  We summarize the facts presented to the jury, reserving additional facts for later discussion.  The convictions stemmed from allegations of nonconsensual sexual conduct that occurred at a University of Massachusetts (UMass) dormitory.  On the evening of October 12, 2012, the victim, a first-year student at UMass, became very intoxicated after drinking alcohol with her friends in her dormitory.  Between midnight and 1 A.M., the defendant, Adam Liccardi, Justin King, and Caleb Womack, who were acquaintances of the victim and did not attend UMass, arrived uninvited at her dormitory.[3]  The four

---

[2] Because we conclude that the defendant's ineffective assistance of counsel claim requires reversal, we need not reach the remaining claims raised on appeal.

[3] All four men were indicted for raping the victim. Following separate jury trials, Adam Liccardi was convicted of two counts of aggravated rape and one count of rape, and Justin King was convicted of three counts of aggravated rape.  Caleb

2

men partied in the victim's room with the victim and two of her friends who lived on the same floor of the dormitory. At one point, the victim became so intoxicated that she could not stand up without assistance. In response to her condition, the victim's friends assisted the victim getting into her bed and told the defendant, Liccardi, King, and Womack that it was time to leave the victim's room. Despite this directive, Liccardi and King remained in the victim's room, and the defendant, along with Womack, returned to her room soon after the victim's friends had departed. The four men then engaged in sexual acts with the victim while she was in and out of consciousness. The defendant later admitted that he penetrated the victim's vagina with his penis.[4] When the victim began to cry loudly, the defendant, King, and Womack stopped and left her room. Liccardi remained with her and sought to console her before sexually assaulting her again.

The next morning, on October 13, the victim, who was visibly upset and bruised, told one of the friends who had

---

Womack pleaded guilty to reduced charges of rape and indecent assault and battery.

[4] The defendant, during his interview with the police On October 17, 2012, admitted that he penetrated the victim's vagina with both his penis and finger, and anally with his finger. At trial, the defendant testified that he only penetrated the victim's vagina.

3

assisted her the night before that she had been repeatedly raped by the four men. On the morning of October 15, 2012, the victim reported the assault to UMass police. The victim allowed the police to view her phone after telling them that she had communicated with the defendant through text messages in the days following the rape. The police then took photographs of text messages displayed on the victim's phone, between the victim and the defendant. On the same day, the victim underwent a sexual assault nurse examination at a nearby hospital. The subsequent examination of sperm samples from an external genital swab and vaginal swab taken from the victim showed a match with the defendant's DNA.

On October 17, the UMass police interviewed the defendant. During the interview, the defendant stated he had what he believed to be consensual sex with the victim. He described how he and the three other men "took turns" engaging in sexual acts with the victim. The defendant claimed it was consensual but admitted the incident was out of character for the victim. He described her condition as being "drunk," but not so intoxicated that she could not consent to the encounter. The defendant admitted that he responded to the victim's text messages to him the following day. He also admitted that he sent text messages to King, Liccardi, and Womack concerning the victim's allegation

4

that they had sexually abused her.  When the police asked the defendant to see his phone, the defendant declined to show it to them.  However, at the end of the interview, the police seized the defendant's phone without either a warrant or his consent.  On November 26, forty days later, the police applied for and received a search warrant for the cell phone.

The search of the defendant's phone yielded text messages between the defendant and the victim,[5] and between the defendant and his codefendants; ninety-eight of these messages were admitted at trial.  For example, on the morning after the alleged rape, the victim sent a text message to the defendant, "You fucking brought them and didn't stop it.  I'm fucking bleeding internally."  The defendant responded by messaging the victim, "I'm sorry.  I shouldn't have let that happen" and "I failed you as a good friend and I'm sorry."

In another text message to the defendant, the victim demanded five hundred dollars from the defendant and the other men, warning the defendant that she would "tak[e] you all to court" if they did not pay her.  The defendant responded to the victim's demand for five hundred dollars by texting, "[I']ll talk to everyone and get [you] the money."  Approximately one

_____

[5] As noted supra, the victim had previously shared the texts between her and the defendant with police.

5

hour later, the defendant sent a text message to King saying, "Call me after work we have to talk." The next day, on October 14, the defendant sent a text message to Womack asking him to meet in person. And, on October 15, the defendant sent a text message to Liccardi and stating that they needed to talk about "what [the victim] wants to do to us." When Liccardi asked if they were "beat," the defendant replied, "We aren't beat . . . she tried blackmailing us so that's our defense."

On October 15, King sent a text message to the defendant and asked, "What if they have cameras in the hallways?" and the defendant replied, "Let's hope they don't." During the following two days, the defendant and King exchanged text messages about trying to convince Liccardi and Womack to pay the victim the money she requested to avoid criminal charges. The defendant communicated that they needed to do something to take care of "the [victim] situation." In one exchange, the defendant agreed with King that they were "fucked" if the victim took them to court, that they "all" had to talk to get "rid of this problem as fast as possible," and that they should pay the victim whatever money she demanded.

The defendant's trial counsel did not move to suppress these text communications as fruits of an unlawful search and seizure of the defendant's phone.

6

Discussion.  When a defendant moves for a new trial based on ineffective assistance of counsel, the defendant must demonstrate (1) performance on the part of counsel falling measurably below that of an ordinary, fallible attorney, that (2) effectively deprived the defendant of a substantial ground of defense.  See Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).  When a defendant asserts a claim of ineffective assistance based on counsel's failure to file a motion to suppress, "the defendant has to demonstrate a likelihood that the motion to suppress would have been successful."  Commonwealth v. Comita, 441 Mass. 86, 91 (2004).  In addition, the defendant must show prejudice, that is, "a 'reasonable probability' that, 'but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  Commonwealth v. Mahar, 442 Mass. 11, 15 (2004), quoting Strickland v. Washington, 466 U.S. 668, 694 (1984).  See Comita, supra at 90, quoting Kimmelman v. Morrison, 477 U.S. 365, 375 (1986).  We review the denial of a motion for new trial for an abuse of discretion or any other error of law.  See Commonwealth v. Lane, 462 Mass. 591, 597 (2012).

1.  Likelihood of suppression motion's success.  Police may retain an item seized without a warrant for "the relatively short period of time needed . . . to obtain a search warrant,"

7

but must release the item if a warrant is not obtained within that period (citation omitted).  Commonwealth v. Gentile, 437 Mass. 569, 573, 575 (2002).  For this reason, once a warrantless seizure has been executed, the police "must make it a priority to secure a search warrant that complies with the Fourth Amendment."  Commonwealth v. White, 475 Mass. 583, 593 (2016), quoting United States v. Burgard, 675 F.3d 1029, 1035 (7th Cir.), cert. denied, 568 U.S. 852 (2012).  If the police fail to do so, the seizure, even if "reasonable at its inception because based upon probable cause[,] may become unreasonable as a result of its duration."  Segura v. United States, 468 U.S. 796, 812 (1984).

"[T]here is no bright-line rule that demarcates when a delay is unreasonable."  Commonwealth v. Cruzado, 480 Mass. 275, 283 (2018).  Rather, the inquiry involves "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion" (citation omitted).  White, 475 Mass. at 593-594.  "'[C]ourts have identified several factors highly relevant to this inquiry,' among them, and of particular importance here, whether police acted 'diligen[tly] in obtaining the warrant.'"  Id. at 594, quoting United States v. Laist, 702 F.3d 608, 613-614 (11th Cir. 2012).

8

A reasonable delay in obtaining a search warrant may be justified by a strong government interest.  See Cruzado, 480 Mass. at 284 (Commonwealth's interest in defendant's phone was strong and justified ten-day delay in seeking search warrant where "police had probable cause to believe that evidence critical to a recent murder was present on the cell phone").  See also Illinois v. McArthur, 531 U.S. 326, 332-333 (2001) (reasonable to prevent suspect from entering home for two hours while police obtained warrant); United States v. Van Leeuwen, 397 U.S. 249, 252-253 (1970) (reasonable for police to seize package for twenty-nine hours while seeking warrant).

In assessing the reasonableness of the delay, though, a strong government interest in the property may be outweighed by other factors such as lack of diligence in obtaining a warrant, and a defendant's strong possessory interest in the property.  See White, 475 Mass. at 590, 595.  See also United States v. Pratt, 915 F.3d 266, 271-272 (4th Cir. 2019).  The court's reasoning in Pratt is instructive to the instant case.  In that case, the court held that a thirty-one day delay in obtaining a warrant for a defendant's cell phone was unreasonable even after determining that the government had a strong evidentiary interest in the phone because the defendant, who was being investigated for running a prostitution ring, admitted it

9

contained nude pictures of an underage sex worker. Id. at 270-272. The court concluded that the government's strong interest in the phone did not outweigh the defendant's "undiminished possessory interest" because "[h]e didn't consent to its seizure or voluntarily share the phone's contents." Id. at 272. Further, the defendant's phone did not have evidentiary value independent of its contents that would justify its indefinite seizure. Id. at 273. Cf. Commonwealth v. Arthur, 94 Mass. App. Ct. 161, 165 (2018) (cell phones' located in separate cars at crime scene of coordinated shooting provided independent evidentiary value on question of joint venture). Given the defendant's "undiminished interest" in the phone, the court reasoned that by not taking steps to obtain a warrant for thirty-one days, the government had not acted with diligence and the delay was unreasonable. See Pratt, 915 F.3d at 273.

Here, like in Pratt, the government had a strong interest in the defendant's phone because of the evidence that it contained -- incriminatory text communications with the victim and codefendants. See Pratt, 915 F.3d at 270-271; see also Cruzado, 480 Mass. at 284 (strong government interest justified ten-day delay in seeking warrant where "police had probable cause to believe that evidence critical to a recent murder was present on the cell phone"). However, the defendant's

10

possessory interest in his phone was also similarly strong to that in Pratt considering that he did not consent to its seizure.  See Pratt, supra at 272-273.  Contrast Cruzado, supra at 283-284 (minimal possessory interest in cell phone where defendant disclaimed it belonged to him).  Moreover, the phone was not relevant independent of its contents.  See Pratt, supra at 273.  Therefore, whether law enforcement was diligent in obtaining the warrant becomes critical.  See White, 475 Mass. at 594-595.

The Commonwealth argues the forty-day delay did not result from a lack of diligence.  It argues the complexity of the investigation into the defendant and his codefendants, when accounting for facts that the police were obtaining other warrants and that multiple law enforcement agencies were involved, justified the delay.  We disagree.  While "the nature and complexity of the investigation" are factors in discerning the reasonableness of a delay, Laist, 702 F.3d at 614, "[t]he relevant inquiry . . . does not concern the detectives' general diligence in performing their duties, but, rather, whether they acted 'diligen[tly] in obtaining the warrant.'"  White, 475 Mass. at 594, quoting Laist, supra.

Here, the UMass police did not act diligently in obtaining a warrant once they seized the defendant's phone without his

11

consent.  For instance, there is no indication from the record that the police "put the ball in motion" soon after seizing the phone by drafting or otherwise preparing the warrant affidavit.  Cf. Laist, 702 F.3d at 610-611 (twenty-five day delay reasonable where law enforcement demonstrated diligence by beginning to prepare warrant affidavit eight days after seizure and exchanged drafts of affidavit with prosecution thereafter).  In contrast, the police appeared to be diligent in other matters involving this investigation, as they applied for and obtained eight other warrants two days after the defendant's phone was seized.[6]  However, the police failed to prioritize obtaining a warrant for the defendant's seized cell phone.  See White, 475 Mass. at 594-595 (sixty-eight day delay in obtaining search warrant unreasonable because police required to act diligently in obtaining warrant and "it does not appear that they did so, having instead focused on . . . applying for and executing five other search warrants related to this case).  See also Burgard, 675 F.3d at 1035 (prioritizing warrant "entail[s] diligent work to present a warrant application to the judicial officer at the earliest reasonable time").

---

[6] UMass police seized the defendant's phone on October 17, 2012.  On October 19, 2012, the UMass police applied for and obtained four search warrants (for the "bodies" of the defendant, Liccardi, Womack, and King) and four arrest warrants (for the defendant, Liccardi, Womack, and King).

12

Furthermore, the search warrant affidavit for the defendant's phone did not establish there was anything complex about drafting a warrant for digital forensic examination that would explain the delay here. See United States v. Mitchell, 565 F.3d 1347, 1351 (11th Cir. 2009) (court found twenty-one day delay in obtaining search warrant unreasonable noting affidavit did not contend officer preparing warrant was unfamiliar with background of child pornography investigation or that he lacked sufficient knowledge to prepare affidavit). Nor does the record reflect that the cell phone data extraction process was particularly unfamiliar or difficult for the State police such that additional preparation by the UMass police would be required. In fact, the warrant appears to contain "boilerplate" language concerning the phone's capacity to store data as well as the extraction of such data.[7] Once the UMass police obtained the search warrant, a State police detective, who had previously performed "at least [fifty]" cell phone data extractions using the same software tool as he used here, extracted the cell phone data from the defendant's phone in less than two days.

---

[7] The affidavit was limited to the following language pertaining to extraction of data:

"I know that these various forms of data that are stored within cellular phones can be extracted from the phone. Extraction involves police making a copy of the data within the cellular phone."

13

Because the defendant maintained a strong possessory interest in his phone, the police had an obligation to either obtain a warrant without unreasonable delay or to return the property; they did neither. After balancing the nature of the intrusion to the defendant's Fourth Amendment interest in his cell phone with the Commonwealth's interest in accessing the phone's contents, accounting for the Commonwealth's lack of diligence in obtaining a search warrant, on the record before us, we conclude the forty day delay here was unreasonable. See White, 475 Mass. at 593-594. Thus, the defendant has shown a likelihood that a motion to suppress evidence recovered from his phone would have been successful.

2. Reasonable probability of different verdict. To prevail on his motion for new trial based on ineffective assistance of counsel, the defendant must also show a reasonable probability that the verdict would have been different without the admission of the text messages that would have been excluded but for counsel's incompetence. See Comita, 441 Mass. at 91; Commonwealth v. Pena, 31 Mass. App. Ct. 201, 205 (1991). Such a probability exists here due to the highly prejudicial nature of the text messages that the jury never should have considered. Specifically, the defendant's cell phone contained messages with all three of his codefendants concerning the nature of their

14

encounter with the victim that supported the Commonwealth's theory of the case and directly contradicted both of the defendant's primary defenses at trial -- first, that he did not take part in a joint venture to rape the victim,[8] and second, that his encounter with the victim was consensual. The Commonwealth relied significantly on the text messages to show the defendant's consciousness of guilt,[9] as well as to establish his willful participation in the joint venture to rape the victim. Notably, the Commonwealth's theory of joint venture was not limited to the element of aggravation, but also was the basis for the underlying elements of the rape charges.[10]

---

[8] The judge's final instructions to the jury concerning the Commonwealth's theory of joint venture included: "You have heard evidence of statements made in text messages purported to have been sent by Justin King, Caleb Womack, and Adam Liccardi. The Commonwealth offered that evidence against the defendant Bile to show his alleged participation in a joint venture."

[9] The Commonwealth articulated its consciousness of guilt rationale for admission of the text messages in its motion to "Admit Defendant's Text Messages with Co-Defendants Post-Incident Reflecting Consciousness of Guilt"; the trial judge allowed the motion.

[10] The prosecutor expressly indicated this theory when, in response to the judge's request for clarity as to her proposed jury instruction concerning joint venture, responded: "I think once [the jury] ha[s] found a joint venture, that there was a joint venture, it is both, justifies a finding of culpability on the three counts [of rape] and it also justifies a finding of the third element for aggravated rape." The judge instructed accordingly with no objection from the defendant.

15

Consistent with its theory of proof, and to cast doubt on the defendant's defenses, the Commonwealth emphasized the defendant's text messages in its opening and closing statements, and during its cross-examination of the defendant. For example, in the Commonwealth's opening statement, the prosecutor offered the text messages from the defendant to his codefendants to demonstrate they had worked in concert, stating, "you'll see those text messages between them . . . and you will see that they wanted to take care of the [victim] situation, this problem as fast as possible, and they agreed to pool the money to pay her." The Commonwealth also relied on the text messages to show the defendant's consciousness of guilt, telling the jury, "[you] will also see [the codefendants] had several concerns," including "the possibility of surveillance cameras in the dorm."

During the Commonwealth's cross-examination of the defendant, the prosecutor relied on his text messages to the codefendants to provide damaging context to the statements he made to the victim on the morning after the alleged rape occurred. The prosecutor also confronted the defendant with the text messages amongst him and his codefendants planning their defense that the victim was blackmailing them, and in addition, admitted that they would be "fucked" if the victim took them to court.

16

The prosecutor, in her closing argument, again used the defendant's text messages to demonstrate that he was part of a joint venture to rape the victim, first by stating "look to his own text messages" to show "[h]e's not the good guy and [his codefendants] the bad guys.  He's just as much a part of this group . . . a part of what happened."  The prosecutor concluded her argument in part by emphasizing how the text messages proved the defendant's participation in the joint venture as well as his acknowledgment of guilt.[11]

The Commonwealth's reliance on the text message evidence throughout the trial demonstrates its belief that this evidence was highly persuasive in establishing the defendant's guilt. Considering that the incriminating text messages related directly to the elements of the offense, we conclude that there is a reasonable probability the verdict may have been different

---

[11] The jury could have reasonably viewed the text messages as far more damaging that the defendant's admission in which he minimized both his shared intent with his codefendants concerning their trip to UMass as well as the acts he committed against the victim.  For instance, the prosecutor argued:

"And if you need more evidence [that the defendant is as culpable as his codefendants] . . .  look to his own text messages.  Text messages he testified about yesterday, you'll have in writing.  You can read those.  He went there with the plan to fuck dem bitches, excuse my language.  To put it in.  To put it in the butt.  That's what he's saying twenty-four hours before arrival there at UMass."

if such evidence had been excluded from the trial.  See

Commonwealth v. Alvarez, 433 Mass. 93, 104 (2000) ("Where, as

here, the very matter as to which defense counsel has been

ineffective becomes one of the linchpins of the prosecutor's

closing, the defendant has met [their] burden of showing

prejudice"); Commonwealth v. Segovia, 53 Mass. App. Ct. 184, 193

(2001) (ineffective assistance where counsel's failure to move

to suppress evidence "opened the door to numerous negative

inferences against the defendant, all of which were explored in

the prosecutor's opening and closing").  A motion to suppress

the significant, illegally obtained contents of the defendant's

phone would have represented "better work [that] might have

accomplished something material for the defense."  Commonwealth

v. DiGeronimo, 38 Mass. App. Ct. 714, 730 (1995), quoting

Commonwealth v. Satterfield, 373 Mass. 109, 115 (1977).

Conclusion.  We reverse the order denying the defendant's motion for a new trial.  The defendant's convictions are vacated, the verdicts are set aside, and the matter is remanded to the Superior Court for a new trial.

So ordered.

By the Court (Massing, Hand & Smyth, JJ.[12]),

Clerk

Entered:  April 16, 2025.

---

[12] The panelists are listed in order of seniority.